Bertram Harnett, J.
I. CHILDREN AS NONPEOPLE
To what extent are children nonpeople in the view of the law?
In our decades, the awakening to. social disadvantage of women, Blacks, Native American Indians, people of varying sexual orientation, and others, has worked dramatic alteration *735 in statutory rights and legal process. Now concerned adults rally to the cause of another major grouping of human beings they deem legally unfavored — children.
The unfair treatment of children in abusive situations, in custodial disputes, in property rights and litigation, and, in generally receiving their share of social distribution, has engaged serious-minded interest. Effective forensic work on behalf of children of the Citizen’s Committee for Children of New York City, for instance, is commonly known. The Association of the Bar of the City of New York now maintains a Special Committee on Children’s Rights. Publicly emerging child advocacy groups in this vicinity include the Community Service Society’s Committee on Youth and Correction, the Juvenile Rights Project of the American Civil Liberties Union, the Children’s Rights Project of the New York City Civil Liberties Union, and the Child Welfare League of America.
II. LIMITATIONS OF CHILDREN SUING THEIR PARENTS FOR NEGLIGENCE
Amidst more publicized flurries in executive, administrative, and legislative sectors, a significant series of principles affecting the legal rights of children is quietly unfolding in the New York courts. It relates to the circumstances under which children can sue their parents for damages for negligence.
Traditionally, in New York, by judicial fiat and not by statute, children could not sue their parents for negligence. In 1969, however, the New York Court of Appeals, the State’s highest Court, dramatically cast aside that limitation. In Gelbman v Gelbman (23 NY 2d 434) a mother who was a passenger while her son was driving the family car was permitted to sue him for causing an accident which injured her. Parents and children, by the court’s ruling, could sue each other for negligence.
In 1974, the issue returned to the Court of Appeals in another and more difficult manifestation. Holodook v Spencer (36 NY 2d 35) posed three situations involving children injured at play. In each circumstance, the parent was accused of negligence in failing to provide adequate parental supervision. The court found that negligent supervision by a parent was not an actionable wrong at all. As lawyers say it, inadequate parental supervision is not a tort.
A significant part of the Court of Appeal’s reasoning in Holodook is overtly connected with a surfacing wariness of the consequences of its action in Gelbman in permitting children *736 to sue their parents in the first place. Quite apparently, the court entertains a residual concern for the preservation of familial harmony and avoidance of economic tension, although why those desirable goals are to be reached by sacrificing only the child’s interest may be debatable. More cogently, the court feels that parenthood is difficult enough to discharge without judicial monitoring, and that parental discretion is necessarily too individual to be measured against the norm of a reasonable parent, the fulcrum of classical negligence litigation.
This being so, what does Holodook really mean to children in light of some of its generalized language, subsequent commentary, and lower court interpretation? For instance, in our instant case, we are confronted with a mother who is charged with negligently entrusting her child with a dangerous instrumentality (here, an automobile) which injured the child in its anticipated use. If the car were entrusted to any unrelated child, the cause of action by the child would be maintainable without a speck of doubt. (Restatement, Torts 2d, § 390.) Is the right to recover damages to be denied to a child because her mother’s handing her that dangerous instrument is an abdication of proper parental supervisory practice, whatever else it also may be? (Cf. Lampman v Cairo Cent. School Dist., 81 Misc 2d 395.)
Is there a difference between a child being able to sue her parent for injury by negligent driving and for injury by negligently handing over the family car when the child is not competent to handle it? Is Gelbman, which allows one family member to sue another for negligent driving, being left marked as a special instance of compulsory auto liability insurance during a general judicial retreat from the lately proclaimed ability of children in New York to sue their parents? (See, David D. Siegel, Practice Commentary, McKinney’s Cons. Laws of NY, CPLR, C3019:42, pp 244-253; 1975 Supplementary Practice Commentary, C3019:42, pp 10-11.)
Or, can a mother sue a child, but a child not sue the mother in automobile negligence?
The distaste of the current majority in Holodook for allowing a child to recover in negligence from an improperly supervising parent is by no means a firm platform to base a more general deprival of rights by demonstrably injured children. As we discuss below, there are numerous instances of parental obligation to or for children in appropriate circumstances. The law typically recognizes liability for breach of *737 supervisory duty for those who afford child care in the shoes of parents, such as teachers, camp counselors, doctors, nurses, drivers, babysitters, playground directors, and others. Moreover, other States have given children the right to sue their parents for negligent supervision. (Holodook, supra, p 49.) And, we find Judge Jasen’s dissent in the Holodook decision disturbingly acute, particularly as he raises the fundamental issues of a parent’s "breach of the duty of care reasonably to be expected” by a child, the rights of nonparent defendants to apportionment in the context of the evolving system of comparative fault, and the practical ubiquity of insurance in tort litigation. (See pp 51-53.)
III. BACKGROUND OF THIS PROCEEDING
Eleanor T. Cangelosi was a minor in 1972, living with her mother. She was seriously injured when the car she was driving collided with another. Her mother had given her the car to drive even though Eleanor had no driver’s license. Now, Eleanor sues her mother for negligently entrusting a dangerous instrument (the car) to her. She also sues others not involved in this particular proceeding.
Allstate Insurance Company insured Mrs. Cangelosi’s car for automobile liability, and it has so far been defending her in Eleanor’s negligence suit. The mother also had a Homeowner’s insurance policy with Reliance Insurance Company, which has refused to defend claiming its policy excludes liability coverage for the "ownership, maintenance, operation, use, loading or unloading of automobiles” while away from the home.
Allstate brings this declaratory judgment action to resolve the rights and obligations of the insurers.
IV. THIS PROCEEDING IS REALLY AN INSURER CONFRONTATION
Actually, the proceeding we have here is strictly between two giant insurance companies. It arises as a declaratory judgment action by Allstate against Reliance.
The insurance setting is not novel. While the courts alternately move in a desired way because there is insurance, or articulate movement in another direction notwithstanding the presence of insurance, the posture here underlines the pragmatic proposition that in modern lawsuits insurance is rarely far from the table top.
The threshold question for our insurers is whether Reliance is exculpated by virtue of its automobile exclusion since the *738 claim arises from an automobile accident. With that answer framed below in the negative, the major question emerges— can the mother be liable to the child at all under the Gelbman-Holodook synthesis? We answer that she can be liable. To both answers the pivotal conception is the dealing in a dangerous instrumentality.
The issue, while narrowly framed in insurance company accounts, is important to all children. Their special dependency leaves them voiceless in a world of adults. It is doubly important for the courts, pious declarers of responsibility for child welfare in countless instances, ostensible guardians of infants’ litigative efficacy, to be particularly tender to their rights as people. For children are people, and they are among our most defenseless ones.
V. THE AUTOMOBILE EXCLUSION OF ITS HOMEOWNER’S POLICY DOES NOT SHIELD RELIANCE INSURANCE COMPANY
Reliance cannot reach for its automobile exclusion to avoid coverage here. The claim in the tort action is only incidentally related to the "ownership, maintenance, operation [or] use” of the Cangelosi car. It is principally based on the negligent entrustment of a dangerous instrument, which in this case happens to be a car.
The courts of this State have made plain this feature of Homeowners policy interpretation. In Lalomia v Bankers & Shippers Ins. Co. (35 AD2d 114, affd on opn. of App Div, 31 NY2d 830) an insurer under a Homeowners policy was held susceptible to liability for the negligent entrustment of a motorized bicycle to a child notwithstanding the existence of a vehicular exclusion similar to the one in this case. (See, Government Employees Ins. Co. v Chahalis, 72 Misc 2d 207.)
Reliance does not dispute this so much as it argues that the Lalomia result should not apply here because the plaintiffs’ identities are different. In Lalomia, the plaintiff’s decedent was injured when his car collided with an infant on a motorized bicycle, and it was the third-party victim who sued the infant’s father for negligently giving this infant the dangerous thing, the motorized bicycle. In the present case, the plaintiff is not some third party who was injured by the infant. It is the infant herself who was injured and who sues her mother for giving her the dangerous thing, the car.
Reliance advances no rationale to Vary the Lalomia policy interpretation because of the different suing identities. So far as that particular policy exclusion is concerned, the distinc *739 tion carries no difference. Lalomia settles the question of liability under a Homeowner’s policy for entrustment of a dangerous thing, even if the dangerous thing is a car. Gelbman and Holodook, taken together, mean a parent can be liable for negligently turning over a dangerous thing to her child.
VI. A PARENT CAN BE LIABLE TO HER CHILD FOR NEGLIGENTLY GIVING HER A DANGEROUS INSTRUMENTALITY
The critical distinction under Holodook is between privileged supervisory acts which occur only within the essential parent-child relationship, and, the breaching by the parent of a duty she owes the world at large, such as the duty to drive a car carefully, or to exercise care with a dangerous instrumentality.
A. FACTS OF THE HOLODOOK CASE
Actually, three separate cases were decided under the caption of Holodook v Spencer (36 NY2d 35).
In one, an infant was injured when he fell from an 11-foot-high slide in a playground with his father nearby. In another, an infant playing in a neighbor’s backyard was injured when the neighbor’s son hit him with a lawnmower while his mother was inside the neighbor’s home. In the third, an infant was run over when he ran out from between parked cars in his mother’s presence. In each case, the infant’s parent was alleged to be liable for failing to supervise the child, for failing to observe his activities and keep him safe from harm. The issue arises both in the context of an infant directly suing her parent, and, of a third-party defendant claiming the parent is at least partially at fault and should contribute to any damages. The court saw that the supervision issue went to the heart of the parent-child relationship and it refused to find negligent parental supervision an actionable tort.
B. ENTRUSTING A DANGEROUS INSTRUMENTALITY TO A CHILD BREACHES A DUTY QUITE APART FROM FAMILY RELATIONSHIP
The Holodook court distinguished its three instances from one where the adult’s duty arose outside the parent-child relationship. It referred to Gelbman (supra) which had previously ruled that a child passenger could sue a parent driver for injuries sustained in a car accident, just as any other passenger could.
The Holodook Court said (p 50-51), in part: "Of course, where the duty is ordinarily owed, apart from the family *740 relation, the law will not withhold its sanctions merely because the parties are parent and child. This is the consequence of Gelbman. There, the duty to drive carefully was owed to the world at large and derived from the parties’ relation as driver and passenger; that the parties were also child and parent was a fortuitous fact, irrelevant to both the duty and to a determination of its breach.”
While there is no special duty to supervise a child arising out of the ordinary parent-child relationship upon which a child can sue, an injured child can sue her negligent parent for breaching a duty the parent owes to the world at large. (See also, Morales v Moss, 44 AD2d 687 [concurring and dissenting opns]; Wheeler v Bello, 78 Misc 2d 540.)
If under the circumstances Mrs. Cangelosi’s conduct was negligent entrustment of a dangerous instrumentality, she would have been liable if the user were an infant other than her daughter. The fact that her daughter was the user impinges on no special parental relationship. The case rather is a familial descendant of Gelbman, and the inheritor of its sense.
In Lampman v Cairo Cent. School Dist. (81 Misc 2d 395) the court was faced with the very playground slide sitúation forming one of the three parts of Holodook. Its only added fillip was the plaintiffs allegation that the parent allowed the child to use a dangerous instrumentality, namely the playground slide. While it would have been enough to rely on the Holodook holding in the precise fact situation presented and to treat its particular pleading as a discursive device, the Lampman court found it necessary to infer that by virtue of Holodook a parent’s negligence in allowing a child to use a dangerous instrumentality is actionable only where it results in injury to a third party and not where it results in injury to the child. This is an unfortunate portent for children.
1. THE APPLICATION OF GELBMAN
There are all kinds of difficulty with the reasoning that entrustment with a dangerous thing is only another form of inadequate parental supervision, and, if actionable, is only so by an injured third party and not an injured child.
The most obvious refutations center about Gelbman, which gave children the right to sue parents for their own injuries. It abolished the intrafamilial immunity from tort suit in ringing terms. True, there is some thread in the authorities that Gelbman is on its way to consignment to a special insurance limbo. New York’s compulsory insurance law virtu *741 ally guarantees that an insurer, not a parent, will be the first party in interest in an automobile case. (See, Siegel, Practice Commentaries, supra.) But, Gelbman simply cannot be explained away on grounds of compulsory automobile liability insurance for at least two reasons.
The Holodook majority specifically negated insurance as a basis for a negligence cause of action saying (pp 47-48): "Yet, we are not prepared to find that the existence of insurance in the particular case provides a sufficient condition for the existence of a cause of action in negligence.” If Gelbman is to be simply an insurance freak, some Judge is going to have to say so, out loud, for the stakes are too high, the responsibilities too weighty.
Moreover, compulsory insurance need only provide minimum coverage. In the serious injury cases, the ones subject to most concern, the minimum insurance is likely to fall far short of the pain and suffering component so typically and dominantly present. Where then is the insurance fund presumably relied upon to safeguard harmony and to assuage family tension? (Parenthetically, we observe that in the instant case, there is not one, but two potential insurance fund sources.)
Surely, the actual fact that in Gelbman, under the particular circumstances presented, the parent was allowed to sue the child, not vice versa, is meaningless. No one yet has urged magnifying such an unreciprocal injustice.
2. ONCE PARENTAL MISCONDUCT IS SUBJECT TO LEGAL EVALUATION, NO REASON EXISTS TO DISCRIMINATE AGAINST A CHILD AS OPPOSED TO A STRANGER
Nor does Holodook require the conclusion that acts which are actionable where injury results to a stranger are not actionable where injury results to the actor’s own child.
The gist of Holodook is that parental failure to supervise a child is not a tort. There is no legal duty imposed, primarily because of the problems implicit in legal oversight of a parent’s comportment to her own child.
But, once the law would call the parent’s ostensibly supervisory treatment of the child tortious as to somebody, and starts evaluating the parental conduct, it has stepped away from its inhibitions and is regulating the parent’s behavior with respect to her child. Under Holodook, a parent is not liable to a stranger for improper parental supervision of the kind which *742 is ordinary and necessary to the familial relationship. But, the parent may be liable to the third party where the harm comes from parental entrustment of the child with a dangerous thing. (Holodook, supra p 45.)
Putting insurance aside (which we are told we must), the major concern of Holodook with Gelbman is gone once the parent is callable to court to account for her conduct. Whenever the kind of misconduct arises which enables an outsider to sue the parent, the child should in fairness have the same right.
3. THERE COMES A POINT WHEN THE CHILD’S RIGHT TO PERSONAL SAFETY MUST BE GIVEN EFFECT
Suppose a parent negligently hands a loaded gun to a three-year-old child who injures both herself and a stranger. Would we say the stranger can recover from the parent and the child not?
This brings us to the vital conception. Is a child a nonperson, to be dealt with as a form of latter day human chattel, or is a child a person with at least some individual rights of her own? Must there not be some compelling justification to deny a child a remedy for injury by parental misconduct where an injured stranger could recover from the parent for that identical misconduct? Holodook presumably finds its justification in safeguarding the family structure by denying parental liability for inadequate supervision within the essential relationship. In so doing, it forecloses not only the child but the stranger as well from complaining as to the parent’s action. There is simply no cause of action by child or stranger alike.
But, now we move away from those custodial or supervisory incidents, which are essential to the parent-child relationship. We are not dealing with an omission, but an affirmative act which is dangerous to the child and which is nonessential to child rearing.
a. The Social Balances
There is an aggregation and balancing of factors endemic to fashioning legal standards in socially fluid situations. It is a form of the computing principle of Edmund Burke skillfully described by the late Prof. A. M. Bickel in The Morality of Consent (Yale 1975, pp 23-24): "The rights of man cannot be established by any theoretical definition; they are 'in balances between differences of good, in compromises sometimes between good and evil, and sometimes between evil and evil. *743 Political reason is a computing principle: adding, subtracting, multiplying, and dividing, morally and not metaphysically, or mathematically, true moral denominations.’ ” There is a difference between rearing a child with the things essential to control of daily or necessary activity and upbringing, and doing unusual acts which have a particularly dangerous context. In its simplest terms, to bring her up, no one has to hand a child a loaded gun, a car, an airplane, or a stick of dynamite.
As part of viewing the total bearing, we see that some acts have a distinct social accountability. Since driving a car (as in Gelbman), or putting an incompetent driver on the public road (as here), represent duties "owed, apárt from the family relation, the law will not withhold its sanctions merely because the parties are parent and child.” (Holodook, supra, p 50.) The parent may be sued where family relationships are "logically irrelevant to the alleged wrong” (p 43.)
The court in Holodook candidly asserted that fear of negligent supervision causes of action cautioned it for a long time against abrogation of the parental immunity rule in Gelbman. It quoted Cannon v Cannon (287 NY 425, 429) in its concern of adding to heavy burden of parenthood by subjection to suit based on "daily experiences common to the upbringing of a child.”
Into the spectrum of interests worth protecting must be inserted that of the child against a parent who subjects her to conspicuously unsafe or dangerous means. It is not only the ordinary rearing experience that must be weighed — it is also the hazardous activity that threatens the child that must be weighed.
b. THERE ARE MANY INSTANCES OF PARENTAL LIABILITY FOR MISCONDUCT TO THEIR CHILDREN — IS THIS ONE OF THEM?
Considerations of family harmony and parental discretion do not require leaving bare of remedy a child who is harmed by conspicuously unsafe parental conduct.
Under the law, a child could always sue her parents for willful or intentionally inflicted parental injuries. (Siembab v Siembab, 284 App Div 652.)
Parents are obligated under the Family Court Act for certain minimum standards of supervisory decency. (Family Court Act, art 10.)
At the core of the controversy then, are two diverging *744 propositions. Under Holodook, a parent is not liable for simple negligence in improper supervision for typical parental activities in common experience; under many authorities, a parent is liable to either the child, an injured third party, or the State, for offensive supervisory actions. In which category does negligent entrustment with a dangerous instrumentality fall?
Is there really a question?
VII. ISSUES TO BE TRIED
There is little doubt that an automobile in the wrong hands can be a dangerous instrumentality. (Golembe v Blumberg, 262 App Div 759; Government Employees Ins. Co. v Chahalis, 72 Misc 2d 207, supra; Cooperative Fire Ins. Co. v Vondrak, 74 Misc 2d 916.) This is underscored by the policy of the so-called "no-fault” statutory provision for automobile accidental injury.
It may be, of course, that daughter Eleanor cannot ultimately prevail against her mother in her tort suit. It may be that she was herself negligent or assumed a risk in borrowing the car from her mother. (Edwards v Pickens, 66 Misc 2d 352.) Or, it may be that Eleanor was a perfectly capablq driver despite not having a license. (Corbett v Scott, 243 NY 66.) This might eliminate any negligence on her mother’s part. On the actual facts, the mother’s conduct may have been reasonable. But that should not preclude her child’s right to litigate the point. The child should not be barred by a locked courthouse door.
VIII. BOTH INSURERS MUST DEFEND THEIR INSURED
This court has before it only an action to declare the responsibilities of insurers and not the underlying tort suit. These issues must be resolved within that suit where all parties will have ample opportunity to present evidence and arguments. At this juncture, we conclude that Reliance has liability under its policy and must defend Mrs. Cangelosi. Allstate too has a liability to defend her under its auto policy.
The insurers have not put before the court any issue as to the relative liability of the insurers for any eventual recovery against Mrs. Cangelosi.
Accordingly, the court does not now rule with respect to apportionment of any insurance proceeds.