OPINION OF THE COURT
Jack M. Battaglia, J.
The simple description of the cause of action in this endorsed complaint, “failure to provide proper services,” belies the difficult legal and human issues that are presented by this claim by a daughter, on behalf of her incompetent mother, against the brother and wife who took the mother in, and against the agency that provided home care services.
Plaintiff Dorothy Jacobs is the guardian of the person and property of Sarah Newton (mother Newton), who is now 75 years old and resides in River Manor Care Home. As described in the order appointing Ms. Jacobs to serve as her mother’s guardian, mother Newton “suffered a stroke that has rendered her aphasic . . . she has partial paralysis, can no longer swallow . . . she is nonambulatory . . . her cognition is nonexistent. . . [and] she suffers from hyperthyroidism and vascular dementia.” From February 1998 until October 2001, mother Newton resided with her son, defendant Robert Newton, and his wife, defendant Joan Newton. During that period, she received home care services from defendant Rockaway Home Attendant Services, Inc., a licensed home care services agency. In October 2001, mother Newton was hospitalized for a month, and then transferred to the nursing home.
Ms. Jacobs alleges that mother Newton was neglected by Robert and Joan Newton and by Rockaway in that, among other things, she was not properly medicated, and was not given adequate food and water, with the result that she suffered serious physical harm. Ms. Jacobs was supported at trial in these charges by two sisters, Alice Gordon and Linda Newton-Watts. Of course, Mr. and Ms. Newton and Rockaway deny the allegations. The Newtons contend that this lawsuit is a manifestation of guilt on the part of Ms. Jacobs and her two sisters because they did not sufficiently attend to their mother when she was in a position to appreciate their attendance.
*173 Before addressing the merits of this dispute, there are two threshold matters that require resolution: the status of the suit as against a defendant named as “Faye Baker,” who has not appeared, and a motion to dismiss by Rockaway based upon the failure of Ms. Jacobs, who is unrepresented by counsel, to designate her representative capacity in the summons with endorsed complaint.
Although known to Ms. Jacobs and Mr. and Ms. Newton as “Faye Baker,” it appears that the name of the home attendant who assisted mother Newton is Shazia Bakaralli. There are two affidavits of service, but neither is sufficient to establish jurisdiction over Ms. Baker/Bakaralli. An attempt to serve her at her purported residence was unsuccessful, the affidavit showing that the process server was told that “Faye Baker” did not reside at the address, and neither affixation nor mailing having taken place. Service was attempted twice at the office of defendant Rockaway, but the testimony at trial was that the attendant was no longer employed by Rockaway when service was attempted, and that no one from Rockaway delivered the summons with endorsed complaint to her. The claim is dismissed as against “Faye Baker,” without prejudice to refiling; this opinion will not address in terms the viability of a claim against the home attendant personally.
The summons with endorsed complaint is dated January 7, 2003, based upon an application for a pro se summons of the same date. “Dorothy Jacobs” is designated as plaintiff. An order appointing guardian of the person and property of Sarah Newton was signed by the Honorable Ariel E. Belen on November 12, 2002, and the commission issued on January 30, 2003 after Ms. Jacobs filed a suitable bond. “[I]n the absence of some express limitation, a cause of action in favor of an . . . incompetent, arising either under the common law or conferred by statute, may be prosecuted by a . . . special guardian.” (Kaplan v Kaplan, 256 NY 366, 367-368 [1931].) Here, Justice Belen’s order gives Ms. Jacobs the power to “defend or maintain any civil proceeding” on behalf of Sarah Newton.
Whether the addition to the caption of Ms. Jacobs’ representative capacity is deemed an amendment of the summons and pleadings, or the addition or substitution of a party, it is supported by the CPLR and case law. (See CPLR 305 [c]; 1003, 3025 [b]; JCD Farms v Juul-Nielsen, 300 AD2d 446 [2d Dept 2002]; Buonomo v Stalker, 40 AD2d 733 [3d Dept 1972]; Van der Stegen v Neuss, Hesslein & Co., 243 App Div 122, 131-132 *174 [1st Dept 1934]; Bogart v Imports of Wantagh, 142 Misc 2d 105, 106-107 [Long Beach City Ct 1988]; Gutman v Branden, 65 Misc 2d 232, 232-233 [Sup Ct, Nassau County 1971].)
No possible prejudice can result to defendants. A document introduced into evidence by Rockaway summarizes a telephone conversation on December 17, 2002 between Ms. Jacobs and a Rockaway representative, during which Ms. Jacobs apparently said that she would be filing a claim based upon neglect of her mother. The answer in person filed by Harold Moorer, Executive Director of Rockaway, although ineffective as an appearance by the corporation (see CPLR 321 [a]), shows that Mr. Moorer understood on January 28, 2003 that the action might relate to the services that Rockaway rendered to mother Newton. When the case was first on the calendar on February 21, it was conferenced both by this Judge’s court attorney and separately by volunteer mediators. More than three months before the trial on June 3, therefore, the parties knew that Ms. Jacobs was complaining about the neglect of mother Newton.
Recognizing, however, that Ms. Jacobs may pursue a claim on behalf of mother Newton does not mean that mother Newton has a viable claim against either her son and daughter-in-law or against the contractor that provided home care services. Those issues involve questions of duty and breach that do not appear to have been previously addressed by a New York court.
Duty/Robert and Joan Newton
In Gelbman v Gelbman (23 NY2d 434 [1969]), an action in negligence by a parent against her unemancipated son arising out of an automobile accident, the Court of Appeals abolished intrafamily immunity for nonwillful torts. The Court concluded that the policy basis for the defense, “preserving family unity,” would be better served by permitting the parent’s action. (See id. at 437.) The law already permitted suit against an emancipated child. (See Crosby v Crosby, 230 App Div 651, 652-653 [3d Dept 1930]; Becker v Rieck, 19 Misc 2d 104, 105 [Sup Ct, Onondaga County 1959], affd 13 AD2d 611 [4th Dept 1961].)
Again, however, removal of any bar of immunity does not establish that Mr. Newton or his wife breached any duty to mother Newton. “There was, at common law, no legal duty upon a child to support his parents.” (Matter of State Welfare Commr. v Mintz, 28 AD2d 14, 16 [2d Dept 1967]; see also Ulrich v Ulrich, 136 NY 120, 122-124 [1892]; Matter of Salm, 171 Misc 367, 370-371 [Sup Ct, NY County 1939], affd 258 App Div 875 [1st Dept 1939], affd 282 NY 765 [1940]; Rutecki v Lukaszewski, 273 App *175 Div 638, 640 [4th Dept 1948].) There have been statutes imposing liability on a child for a parent’s support, which could be enforced by criminal or civil proceedings, including an action by the needy parent, but the most recent were repealed in the mid-1960s. (See Matter of State Welfare Commr. v Mintz, 28 AD2d at 16; Matter of Errico, 49 Misc 2d 1055, 1057 [Sur Ct, NY County 1966].)
The last of the statutes requiring a child to support a needy parent were repealed in connection with the then new Medicare program, in part to lift, what was deemed, a “burden of support.” (See Matter of State Welfare Commr. v Mintz, 28 AD2d at 17.) And so, “absent agreement or other definitive obligation, this State, as opposed to some others . . . does not hold a child liable for the support of his or her parent.” (Matter of Summers v D’Elia, 95 AD2d 184, 193-194 [2d Dept 1983].) Moreover, it is not at all clear that the statutory duty to support that once existed would encompass a duty to provide needed care or medical attention. (See State v Flontek, 82 Ohio St 3d 10, 13, 693 NE2d 767, 770 [1998] [“the duty . . . imposed by the statute is a purely financial one”].)
In the somewhat analogous arena of parental liability to a child, the Court of Appeals has held that “a child does not have a legally cognizable claim for damages against his parent for negligent supervision.” (See Holodook v Spencer, 36 NY2d 35, 40 [1974].) In addition to the “prevention of family discord and the correlative concern to preserve the family’s resources for the aid of all its members” (id. at 46), the Court noted other policy considerations that weighed against allowing the cause of action: “the potential for abuse of a negligent supervision claim when brought in a retaliatory context between estranged parents”; the “difficulty of judicial delimitation, either by court or by jury, of the bounds of the asserted right to supervision”; a danger of “circumscrib [ing] the wide range of discretion a parent ought to have in permitting his child to undertake responsibility and gain independence”; the “different economic, educational, cultural, ethnic and religious backgrounds which must prevail”; and recognition that “[supervision is uniquely a matter for the exercise of judgment” (id. at 49-50).
The Court subsequently extended its reasoning to preclude a cause of action for negligent supervision “between unemancipated minor siblings.” (See Smith v Sapienza, 52 NY2d 82, 84 [1981].) But lower appellate courts have allowed the claim against grandparents with temporary custody and control (see *176 Hadden v Kero-Sun, Inc., 197 AD2d 668, 668-669 [2d Dept 1993]), and even against a parent who voluntarily assumed a duty to supervise a child in a particular activity (see Young v Greenberg, 181 AD2d 492 [1st Dept 1992]). These latter results are consistent with the reality that the “law typically recognizes liability for breach of supervisory duty for those who afford child care in the shoes of parents” (see Allstate Ins. Co. v Reliance Ins. Co., 85 Misc 2d 734, 736-737 [Sup Ct, Nassau County 1976]), and with broader principles of tort law that permit recovery for breach of a duty voluntarily assumed.
And so, “[e]ven without compensation, when defendants undertook to control a young child and provide care for her, they became responsible for her injury through their negligence.” (Zalak v Carroll, 15 NY2d 753, 754 [1965]; see also Appell v Mandel, 296 AD2d 514 [2d Dept 2002]; Mary A. ZZ. v Blasen, 284 AD2d 773, 775 [3d Dept 2001]; Diamond-Fisher v Greto, 276 AD2d 413 [1st Dept 2000]; Bartels v County of Westchester, 76 AD2d 517, 521-522 [2d Dept 1980]; Andrews v County of Otsego, 112 Misc 2d 37, 41-44 [Sup Ct, Otsego County 1982].) “The law is clear that, even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care.” (Parvi v City of Kingston, 41 NY2d 553, 559 [1977].) “[Assumption of the task . . . [is] assumption of [the] duty.” (Glanzer v Shepard, 233 NY 236, 239 [1922].)
In other states, assumption of responsibility for the care of an elderly person can create a common-law duty that is breached when neglect results in harm, and supports criminal liability either under general criminal statutes (see Commonwealth v Pestinikas, 421 Pa Super 371, 617 A2d 1339 [1992]; Davis v Commonwealth, 230 Va 201, 335 SE2d 375 [1985]; State v Brown, 129 Ariz 347, 631 P2d 129 [1981]; Jones v United States, 308 F2d 307 [1962]), or under statutes that specifically penalize the neglect of elderly persons (see Peterson v State, 765 So 2d 861 [Fla 2000]; People v Manis, 10 Cal App 4th 110, 12 Cal Rptr 2d 619 [1992]; but see Billingslea v State, 780 SW2d 271 [Tex Crim App 1989] [common-law duty insufficient, statutory duty required for criminal liability]).
In New York, until recently, there was no statute that specifically penalized the causing of harm to an elderly person. Effective November 1, 1998, as will be described more fully below, it is a crime to endanger the welfare of an elderly person, as defined in Penal Law §§ 260.32 and 260.34. Before that, no *177 reported decision found by this court applied the general criminal law to harm caused to an elderly person. There are numerous decisions, however, in which criminal liability was based upon harm to a child by a person not the child’s parent who assumed responsibility for the child’s care, even if only for a short period of time. (See People v Carroll, 93 NY2d 564, 569 [1999]; People v Wong, 81 NY2d 600, 607-608 [1993]; People v Sheffield, 265 AD2d 258, 259 [1st Dept 1999]; People v Goddard, 206 AD2d 653, 655 [3d Dept 1994]; People v Salley, 153 AD2d 704, 705 [2d Dept 1989].) More than a century ago, a “defendant, having the charge of the infant child named, did unlawfully and feloniously suffer and permit the death of the child, by willfully neglecting, without lawful excuse, to supply it with proper food, clothing, and care.” (People v McDonald, 1 NYS 703, 704 [Sup Ct, 5th Dept 1888].)
In People v Flayhart (72 NY2d 737 [1988]), a husband and wife were found guilty of criminal homicide of the husband’s brother, who “was mentally retarded and afflicted with a number of ailments,” when he “died of neglect while he was living in [their] home and was totally dependent upon their care” (see id. at 740). The result should not be surprising in a state that imposes criminal liability for malnutrition of a horse. (See People v Arcidicono, 79 Misc 2d 242 [App Term, 2d Dept 1974].)
“A person is guilty of endangering the welfare of a vulnerable elderly person in the first degree when, being a caregiver for a vulnerable elderly person . . .
“[w]ith intent to cause physical injury to such person, he or she causes serious physical injury to such person; or . . .
“[h]e or she recklessly causes serious physical injury to such person.” (Penal Law § 260.34.)
A second degree crime is defined when the caregiver intentionally or recklessly causes physical injury that is not serious, or
“[w]ith criminal negligence, he or she causes physical injury to [a vulnerable elderly] person by means of a deadly weapon or a dangerous instrument; or . . .
“[he] or she subjects such person to sexual contact without the latter’s consent.” (Penal Law § 260.32 [3], [4].)
The statute defines a “caregiver” as a “person who (i) assumes responsibility for the care of a vulnerable elderly person pursuant to a court order; or (ii) receives monetary or other valuable consideration for providing care for a vulnerable elderly person”; and defines a “vulnerable elderly person” as a “person *178 sixty years of age or older who is suffering from a disease or infirmity associated with advanced age and manifested by demonstrable physical, mental or emotional dysfunction to the extent that the person is incapable of adequately providing for his or her own health or personal care.” (Penal Law § 260.30 [1], [3].)
Although the criminal statute is new, the fundamental concept of duty on which it is based is not. In Thibault v Franzese (24 AD2d 903 [2d Dept 1965]), the Second Department held that the “defendants’ duty to use reasonable care to protect the plaintiff ... a 73-year old senile woman, whom . . . the defendants had undertaken to care for while she was in their home, was not measured by what their duty would have been to a social guest as a mere licensee . . . They were required to use reasonable care to protect her from injury” (see also Tooker v Tooker, 193 AD2d 563, 563 [1st Dept 1993]).
This court has little difficulty in concluding that a child who assumes responsibility for the care of a parent who is limited by age or illness, or both, owes a duty to the parent to use reasonable care, and will be liable for harm caused by the failure to use reasonable care by affirmative act or omission. The conclusion is supported by “common concepts of morality [and] logic.” (See Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90 NY2d 606, 612 [1997].)
It is unnecessary and would, perhaps, even be inappropriate, for this court to generally define the circumstances that would constitute an assumption of duty or might qualify the parent as sufficiently “dependent” or “vulnerable.” Here, mother Newton resided with her son and daughter-in-law, and, as will appear, they took control of all of her income, presumably to use for her benefit. Because of her physical and mental condition, mother Newton was progressively dependent upon Robert and Joan Newton, and upon the home care attendant that she herself could not effectively supervise, for all of her medical, nutritional and other personal needs. Also, although not determinative, and without suggesting that they acted inappropriately, there was testimony that Robert and Joan inhibited or discouraged participation by Robert’s siblings, with the potential consequence at the least of mother Newton’s further dependence on Robert’s and Joan’s care.
The elements of breach of duty and harm will be addressed below. For now it is enough to say that the court finds helpful an approach suggested by Judge Fuchsberg for assessing a *179 parent’s duty to supervise a child. “What would an ordinarily reasonable and prudent person — taking into account the parent-child relationship — have done in similar circumstances?” (Nolechek v Gesuale, 46 NY2d 332, 346 [1978] [Fuchsberg, J., concurring].) “A mere misjudgment in supervisi[on] . . . would not necessarily constitute a tortious breach of duty.” (Id.) Rather, the facts and circumstances to be considered, in addition to the parent/child relationship, would include the “practical responsibilities, expectations and limitations that flow” from the relationship; the “judgmental nature of the decisions” that must be made; the “age, mental and physical health . . . aptitudes and needs” of the parent; the “presence in the family of . . . children competing for . . . time and attention”; and the “economic social and physical environment in which the . . . conduct occurs.” (Id. at 347.) Also highly important would be consideration of the resources available to assist in the care of the parent, and the limitations of those resources.
The court is mindful that many of the considerations that led the Court of Appeals to refuse to recognize a child’s claim for negligent supervision by a parent would resonate as well on a parent’s claim for neglect by a child. And this court is well aware that the individuals before it are siblings, necessarily exercising their own feelings and conflicts as they argue the interests of mother Newton. But the court believes that these concerns can be ameliorated by careful attention to the many factors balanced on a determination of breach of duty. “Where . . . duty is breached, only the most cogent reasons of public policy should warrant denial of a remedy and consequent deviation from the central principle of Anglo-American tort law, which is that wrongdoers should bear the losses they cause.” (Holodook v Spencer, 36 NY2d at 52 [Jasen, J., dissenting].) Duty/Rockaway Home Attendant Services, Inc.
According to the New York State Association of Health Care Providers, Inc.:
“New York’s Medicaid home care program provides [a] wide range of services to over 186,000 home-bound sick and elderly patients throughout the State (2000 data) while over 176,000 New Yorkers receive home care funded by the federal Medicare Program (2000 data). And of course, thousands of New York State residents purchase home care services privately and others receive home care services through private insurance coverage in both *180 indemnity and managed care benefit plans . . .
“All together, there are approximately 900 home care agencies in New York State, employing over 250,000 workers. In addition to professional nurses, therapists, and assistants, home care agencies hire and train workers as home health aides and personal care aides.” (New York State Association of Health Care Providers, Inc., What is Home Care?, dated Jan. 2003 <http://www.nyshcp.org/ about_home_care.shtml> [accessed July 1, 2003].)
The association advises that “we should expect to see increasing levels of home care utilization ... as a result of shifting utilization away from more costly settings into home care.” (Id.)
The New York Legislature has declared that the “provision of high quality home care services to residents of New York state is a priority concern” (Public Health Law § 3600), and mandated the regulation of home care services as they are provided by, among others, licensed home care services agencies and certified home health agencies. (See Public Health Law § 3600 et seq.\ 10 NYCRR parts 763, 766 [Department of Health Rules and Regulations].) When home care services are provided pursuant to the Medicare or Medicaid programs, there is additional regulatory involvement by federal and local authorities, including the United States Department of Health and Human Services, the State Department of Social Services, and the City Human Resources Administration (HRA). (See Kuppersmith v Dowling, 93 NY2d 90, 93-95 [1999].)
Generally, the institutional custodian of a person with physical or mental limitations owes a duty of reasonable care to protect the person from injury, with the “degree of care owed . . . commensurate with the [person’s] capacity to provide for his or her own safety.” (See Killeen v State of New York, 66 NY2d 850, 852 [1985]; see also N.X. v Cabrini Med. Ctr., 97 NY2d 247, 253 [2002] [referring to a “sliding scale of duty”]; Campbell v Cluster Hous. Dev. Fund Co., 247 AD2d 353, 354 [2d Dept 1998] [“The degree of reasonable care is measured by the plaintiff’s physical and mental infirmities, as known by the defendants”]; Reavey v State of New York, 125 AD2d 656, 657 [2d Dept 1986].)
Relying upon these authorities, the Second Department has held that home care agencies may be liable when an elderly person or a person with a disability suffers traumatic injury because a home care attendant was either not present when *181 she/he should have been or was not sufficiently attentive. (See Esposito v Personal Touch Home Care, 288 AD2d 337, 338 [2d Dept 2001]; Villarin v Onobanjo, 276 AD2d 479, 480 [2d Dept 2000]; Willis v City of New York, 266 AD2d 207, 208 [2d Dept 1999]; Calick v Double A Prop. Assoc., 251 AD2d 278, 279-280 [2d Dept 1998]; see also Lee v Health Force, 268 AD2d 564 [2d Dept 2000].)
Virtually all of the decided cases have involved traumatic injury. “The overwhelming majority of civil cases against nursing homes arising from the treatment of residents involve falls.” (Eads v Heritage Enters., 204 Ill 2d 92, 106-107, 787 NE2d 771, 779 [2003].) But in Goldberg v Plaza Nursing Home Comp. (222 AD2d 1082 [4th Dept 1995], overruled in part on other grounds by Doe v Westfall Health Care Ctr., 303 AD2d 102, 109 [4th Dept 2002]), the Court recognized a claim based on negligence when the failure of nursing home personnel to respond to a patient’s call for help may have resulted in confusion, agitation, and cardiac arrest.
By statute, New York makes a residential health care facility liable to any patient for the deprivation of “any right or benefit created or established for the well-being of the patient by the terms of any contract,” or by any federal or state statute, code, rule or regulation; “as an affirmative defense,” the facility may establish that it “exercised all care reasonably necessary to prevent and limit the deprivation and injury.” (Public Health Law § 2801-d [1].) The statute provides for “minimum damages” of 25% of the “daily per-patient rate of payment” established for the facility, as well as attorney fees. (Public Health Law § 2801-d [2], [4], [6].)
“[T]he clear intent of [this statute] was to expand the existing remedies for conduct that, although constituting grievous and actionable violations of important rights, did not give rise to damages of sufficient monetary value to justify litigation.” (Doe v Westfall Health Care Ctr., 303 AD2d at 109.) The “statutory basis for liability is neither deviation from accepted standards of medical practice nor breach of a duty of care,” but rather the “deprivation of a right conferred by contract, statute, regulation, code or rule.” (Zeides v Hebrew Home for Aged at Riverdale, 300 AD2d 178, 179 [1st Dept 2002].) A cognizable cause of action can be based on the failure to prevent the development of pressure sores and the failure to maintain adequate nutrition. (See id.; see also 10 NYCRR 415.12 [c], [i].)
Like this statute, the developing common law should recognize the “vulnerability and dependence of abused or neglected *182 elders, especially those whose infirmities — mental or physical— leave them at the mercy of their caregivers and those who are physically isolated in their own homes or the homes of their relatives.” (Easton v Sutter Coast Hosp., 80 Cal App 4th 485, 494, 95 Cal Rptr 2d 316, 322 [2000].) There is no reason in principle to limit the duty of a home care provider to the prevention of traumatic injury, thereby excluding liability for longer-term neglect that can have even more serious consequences. A provider should at least be liable for the failure to discharge those duties that it contractually undertook to discharge. (See Doe v Westfall Health Care Ctr., 303 AD2d at 107-108; see also Matter of Pesante v County of Seneca, 2002 NY Slip Op 40503[U], *6, 12 [Sup Ct, Seneca County].)
Breach of Duty
Prior to moving into the second-floor apartment in the building owned by her son and daughter-in-law (Mr. and Ms. Newton lived in the first-floor apartment), mother Newton was receiving home care services from United States Home Care three days each week, four hours each. day. Rockaway’s home attendant task assignment sheet for mother Newton dated February 13, 1998 shows that, initially, home care services were provided by Rockaway on the same schedule. (Rockaway introduced into evidence as a business record what it represented to be mother Newton’s complete file.) The assignment sheet noted mother Newton’s limited mobility and forgetfulness.
In medical requests for home care dated November 4, 1999, November 14, 2000, and February 22, 2001, mother Newton’s doctor recommended increases in home care services. The 2001 request states:
“Presently, Mrs. Newton is receiving 4 hours a day 7 days a week. During the hours of 1 PM and 7 PM, Mrs. Newton is home alone which makes it quite dangerous for a woman with her mental and physical limitations. Please increase her hours that she would have eight hours a day, 5 days a week and 4 hours on Saturdays and Sundays.”
Mother Newton’s home care services were increased to the level recommended by her doctor. According to Ms. Jacobs, these services were paid for by Medicare and Medicaid, but mother Newton was required to pay $24 each month.
Mother Newton moved at some point from the second-floor apartment to the first floor, where she was given the master bedroom with bath in Mr. and Ms. Newton’s apartment. There *183 she stayed until she was hospitalized in late October 2001. Ms. Jacobs contends that neglect by Mr. and Ms. Newton and Rock-away in failing to properly medicate, feed and hydrate mother Newton caused the serious deterioration in her condition that required hospitalization. Ms. Jacobs presented hospital records apparently from New York Methodist Hospital and a statement from a Dr. Alan R Goldman, but the hospital records are not certified, and the doctor’s statement is not sworn to or affirmed. None are admissible as evidence to establish mother Newton’s physical or mental condition.
Because Ms. Jacobs is not represented by counsel, it is not surprising that she has not presented evidence in admissible form. Her pro se status, however, does not relieve her of any requirement that there be expert medical opinion in admissible evidentiary form to establish mother Newton’s physical and mental condition and any causative factors that may have been contributed by defendants. (See Duffen v State of New York, 245 AD2d 653, 653-654 [3d Dept 1997]; Redding v Saunders, 213 AD2d 1015 [4th Dept 1995]; Sabatino v Albany Med. Ctr. Hosp., 187 AD2d 777, 778 [3d Dept 1992]; see also Banushi v Lambrakos, 305 AD2d 524 [2d Dept 2003]; Roundtree v Singh, 143 AD2d 995, 996 [2d Dept 1988].)
Ms. Jacobs, her husband, and her two sisters, Alice Gordon and Linda Newton-Watts, testified to occasions when they visited mother Newton and found her alone, or telephoned without response. Ms. Jacobs testified that she visited her mother every other week, twice each week, once on a weekday and once on the weekend. She found her mother alone at times that, she believed, the home attendant should have been there, but Ms. Jacobs did not quantify these incidents or specify when they occurred. Ms. Gordon testified to four visits during the year 2000 when she visited on a weekday during the home attendant’s scheduled hours and found her mother alone. She told of a Saturday visit when the home attendant should have been present, but she found her mother alone in circumstances that can be described as unpleasant and degrading. Ms. Gordon would also find her mother alone in the evening before Mr. and Ms. Newton returned from work, having obtained the key from the home attendant, who lived nearby. Ms. Newton-Watts testified to visits twice each month, and to finding her mother alone approximately six times. It is not clear that these occasions were during the home attendant’s hours. All three sisters testified that Mr. and Ms. Newton discouraged visits and placed *184 restrictions that prevented the sisters from doing more for their mother.
In addition to the home attendant’s absences, both Ms. Jacobs and Ms. Gordon were concerned about their mother’s eating. Mother Newton was “always hungry,” but she would be found with cold food on a tray. Ms. Jacobs acknowledged that mother Newton could be difficult about food and that, as her condition worsened, it was necessary to put food (and her medications) in her mouth. The sisters spoke to the home attendant about their concerns. After mother Newton was hospitalized, Ms. Jacobs discovered that her $120/month food subsidy had gone unused to the extent of a $370 credit.
Ms. Jacobs testified that she also learned when her mother was hospitalized that mother Newton had not urinated in a week because of dehydration, and that she had not been given her thyroid medication for six months. But Ms. Jacobs introduced no admissible evidence of mother Newton’s medical condition. The issue of the medications is in any event complicated, because of the restrictions placed on a home attendant’s authority to medicate a client. The medication agreement form that mother Newton signed at the inception of the services states that she was aware that home attendants “do not administer medications. However, if medications are prepoured, they would assist the client by handing the container to the client at the appropriate hour.”
Mother Newton was receiving on a monthly basis a Social Security benefit of $573, a pension payment of $74 and a food stamp subsidy of $120. At first, she maintained a joint bank account with Ms. Jacobs, but at some point, apparently at the bank’s suggestion, the account was changed or replaced by an account with Ms. Newton. Mr. and Ms. Newton apparently used some money that mother Newton received on the death of a son to assist in the purchase of the two-family house in which they all lived. Ms. Jacobs acknowledged that she agreed to Ms. Newton’s taking responsibility for mother Newton’s financial matters, and mother Newton apparently understood and agreed to the circumstances of her moving in with her son and daughter-in-law. The court does not understand Ms. Jacobs to be alleging any serious financial impropriety on the part of Mr. and Ms. Newton. Rather, Ms. Jacobs suggested that the additional income caused Mr. and Ms. Newton to keep mother Newton with them, even though they were not able or willing to properly care for her.
*185 Ms. Jacobs testified to bruising on mother Newton’s upper arms, and Ms. Newton-Watts said her brother had once told her mother Newton had fallen when the home attendant was not present. However, all acknowledged that mother Newton is a large woman with progressively limited mobility as her physical and medical condition deteriorated. It does not appear that any of the sisters suspected abuse or intentional mistreatment, and the court does not understand Ms. Jacobs to be alleging any. The court is satisfied, having seen and heard from Mr. and Ms. Newton, that nothing like that occurred.
The three sisters testified that they spoke to Mr. and Ms. Newton about the home attendant’s absences and their other concerns, but they were assured that there was no need for worry, and were discouraged from complaining because the Newtons were reluctant to look for another home attendant. Ms. Jacobs did call Rockaway twice, but, because of the Newtons’ urging, she only inquired about services and schedules, rather than making a complaint. Ms. Gordon also called Rockaway after the unpleasant Saturday incident.
As might be expected, much of the testimony of the three sisters or its significance was disputed by Mr. and Ms. Newton and Rockaway. The Newtons dispute the sisters’ accounts of regular visits, and dispute their contention that visits were discouraged. To the contrary, the Newtons claim that they urged the sisters to visit more often, but that they received “limited cooperation” from the sisters. The Newtons also dispute that the sisters complained to them about the home attendant’s absence, contending that, in any event, the sisters would visit at times when the home attendant was not scheduled to be there. According to the Newtons, it was not until after mother Newton was hospitalized, when the doctors questioned whether she had been receiving her medications, that anyone complained about the home attendant’s absence. The Newtons say that sister Linda even complimented them on mother Newton’s care.
As for the home attendant, the Newtons considered her “not the best” but “pretty good.” Mr. Newton acknowledged that he, too, had telephoned and not received a response, but noted that the home attendant did food shopping and ran errands as part of her duties. Both Mr. and Ms. Newton stressed that, had the home attendant or Rockaway not performed, they would have taken action. They saw no sudden deterioration in mother Newton’s condition, but rather the effects of a progressive debilitating illness over the four years mother Newton was with them. *186 Mother Newton could also be “stubborn” or “uncooperative” at times.
Harold Moorer, Rockaway’s Executive Director since April 2000, testified on its behalf. Rockaway employs approximately 1,000 home attendants, and provides home care services under contract with New York City’s Human Resources Administration to approximately 200 Medicaid recipients. The home attendants receive 44 hours of training and are “supervised” by a nurse. Consistent with the medication agreement form, described above, Mr. Moorer stressed the home attendant’s limited involvement with the client’s medications. Mr. Moorer explained that the initial home attendant task assignment sheet for mother Newton was prepared in accordance with HRA requirements after an in-home assessment by a registered nurse, but that HRA determined the level of service. Mr. Moorer also testified that there was a reevaluation and summary report by a nurse every six months, again in accordance with HRA requirements. However, the filé that Rockaway introduced as mother Newton’s complete file contains only one nurse’s supervisory visit report, detailing a visit on August 14, 2001. The report will be discussed below.
Mr. Moorer described a computerized time-tracking system for the home attendants, recording the time of telephone calls from the client’s premises when the home attendant arrives and departs. The time records for mother Newton’s home attendant indicated no problems, but, of course, the system only provides assurance as to the home attendant’s presence at the starting and ending times. Mr. Moorer also testified that, until a December 2002 telephone call from Ms. Jacobs, Rockaway received no complaints about the home attendant’s absence during her scheduled hours or about the quality of her services.
Mother Newton’s file also contains a client contact record that summarizes monthly “calls,” presumably by telephone, by a “personnel specialist” to the client’s premises. The form does not indicate to whom the caller spoke, but records whether or not the “client and/or family” is satisfied with the service and the home attendant. The client contact record from mother Newton’s “complete” file shows monthly contacts from July 2000 through November 2001, during which the caller noted that the client was doing “well” or “fine” and was “happy” or “satisfied” with the home attendant. The client contact record is problematic, however, because there is evidence that one of the entries may have been falsified. The final entry is dated *187 November 12, 2001, and indicates satisfaction with the home attendant and the service and that the “client and H/A doing fine.” But the file also contains a client update form that states that mother Newton was hospitalized at Methodist on October 23, 2001 and that date was the last date of service to the client. (The home attendant’s time records show service through October 29, which is more consistent with the hospital records.)
The medical opinions contained in the nurse’s supervisory visit report on the August 2001 visit are probably admissible as part of Rockaway’s business records. (See Bruce-Bishop v Jafar, 302 AD2d 345 [2d Dept 2003]; Cohn v Haddad, 244 AD2d 519 [2d Dept 1997].) In any event, the report was introduced by Rockaway, and at the least would show notice to Rockaway of the information and opinions stated. The report’s general conclusion is that the “client needs assistance with all activities.” The report notes no “evidence” of, among other things, bedsores/skin lesions, poor nutrition, emaciation, or dehydration, and recommends a “continu[ation] [of the] current level of care.” The report is somewhat problematic in that it notes “self-endangering behavior,” but for “action taken and recommended follow up” states “none at this time.” The report also notes that the “client lives alone in apt on 2nd floor” and “needs the assistance of HA with all activities to ensure safety.” Nothing in the report indicates that any consideration was given to mother Newton’s safety during the times when the home attendant was not present. The nurse indicated a next visit in November, but apparently mother Newton was hospitalized before another visit.
In assessing whether Mr. and Ms. Newton or Rockaway breached a duty of reasonable care, any alleged failure to properly medicate mother Newton must be set aside. There is no direct evidence that mother Newton did not in fact receive her medications, nor any admissible evidence that would support the inference that she was not properly medicated. The court must note, however, that, had there been such evidence, Rockaway’s reliance on the limited authority of home care attendants with respect to medications would not relieve it of all responsibility for the consequences. With awareness of an elderly person’s failure to take medication, whether as a result of stubbornness, forgetfulness, difficulty swallowing, lack of preparation by a relative, or any other reason, reasonable care would require some action, and no medical evidence or other expert evidence would be necessary for a factfinder to so conclude.
*188 With respect to any alleged malnutrition or dehydration, again, there is no admissible evidence that mother Newton suffered from these conditions. Moreover, as to Mr. and Ms. Newton, there was no expert testimony that “physical manifestations of dehydration and undernutrition” would be “readily apparent.” (See People v Manon, 226 AD2d 774, 776 [3d Dept 1996]; People v Salley, 153 AD2d 704, 705 [2d Dept 1989]; People v Stubbs, 122 AD2d 91, 91-92 [2d Dept 1986].) Expert testimony would be even more crucial to any claim that the Newtons should have known that mother Newton was not receiving her medications, absent direct evidence. Moreover, accepting the testimony of Ms. Jacobs and her sisters as to the frequency of their visits, if there were any “readily apparent” signs of malnutrition, dehydration, or failure to medicate, they, too, presumably would have seen them and they would have taken action.
Rockaway stands on different footing. Although the Newtons were “not in the class of individuals either possessing or under a legal obligation to procure” specialized medical knowledge (see People v Goddard, 206 AD2d 653, 655 [3d Dept 1994]), the same cannot as readily be said of Rockaway’s nurses or even its home attendants. An exploration of the issue must await a more appropriate case, one in which there is medical evidence that the condition existed, as well as a showing as to the regulatory requirements and limitations imposed on home care services.
As to the alleged absence of the home attendant during scheduled hours, neither medical nor other expert testimony is required when there is a “fail[ure] to provide that level of supervision called for in . . . [the] treatment plan.” (See Angell v State of New York, 278 AD2d 776, 778 [3d Dept 2000].) Based upon all of the evidence, the court concludes that there probably were occasions on which the home attendant was not present with mother Newton when she should have been, although the court is not convinced that the Newtons understood that a problem existed. The real question, however, is harm. Unlike the cases in which a traumatic injury occurs during the home attendant’s absence, there is no link here between any one or combination of absences and any consequence to mother Newton. Only the Saturday incident that Ms. Gordon testified about would qualify as evidence of discomfort or indignity. But, without mother Newton’s testimony, it is difficult for the court to assess how she might have perceived the situation at that time, or generally when she was left alone.
*189 Mother Newton was apparently alone often, not only when the home attendant was absent during her scheduled hours, but also at those times when her attendant was not scheduled and the Newtons had yet to return from work. Considering all of the evidence, the court sees a serious question as to whether the Newtons and Rockaway “through the conduct of its employee^],” including the home attendant (see Willis v City of New York, 266 AD2d at 208), either failed to recognize that mother Newton required a greater level of care, at home or elsewhere, or to take appropriate action in response.
In considering whether the Newtons or Rockaway breached a duty of reasonable care to mother Newton in their assessment of an appropriate level and locus of care for mother Newton, the factors to be weighed differ somewhat because of their respective roles. The policy concerns articulated by the Court of Appeals in deciding not to recognize a cause of action by a child against a parent for negligent supervision are, of course, most pertinent when the duty of the Newtons is at issue. Concerns about cultural differences, economic realities, family and other demands, and the elusive qualities of judgment are present here as well. These factors are particularly difficult to weigh by strangers when the choice might be between continued care at home and institutionalization.
Under Mental Hygiene Law § 81.22 (a) (9), a guardian is given the power to “choose the place of abode” of the incapacitated person, but “placement of the incapacitated person in a nursing home or residential care facility ... or other similar facility shall not be authorized without the consent of the incapacitated person so long as it is reasonable under the circumstances to maintain the incapacitated person in the community, preferably in the home of the incapacitated person.” That decision is made in the context of a “clear statutory mandate that [the incapacitated person’s] preferences, wishes and desires should be given great weight ... in light of [the incapacitated person’s] functional level, understanding and appreciation of her functional level.” (Matter of McNally, 194 Misc 2d 793, 795 [Sup Ct, Suffolk County 2003].)
Moreover: “A guardian’s performance in money matters can be watched and evaluated in objective terms. This is not so in family matters. Only under careful judicial scrutiny should guardians ... be allowed to tamper with family relationships in the name of the ward’s best interest.” (Pettas v Pettas, 88 Misc 2d 955, 957 [Sup Ct, Nassau County 1976].) These *190 considerations are highly significant when we do not have any evidence of the wishes of mother Newton, and the question is raised in a civil action on her behalf against the son and daughter-in-law who watched over her, perhaps imperfectly, for four years of progressively debilitating illness.
Whether it is the Newtons’ or Rockaway’s conduct that is being evaluated, to the extent that the alleged breach of duty involves improper assessment of mother Newton’s mental and physical condition, rather than “common sense and judgment,” expert testimony is required. (See Reardon v Presbyterian Hosp. in City of N.Y., 292 AD2d 235, 237 [1st Dept 2002]; see also Angell v State of New York, 278 AD2d at 778.) Beyond that, particularly with respect to Rockaway, and subject to regulatory requirements, “[t]he evaluation of the appropriate level of supervision implicates the professional standard of care . . . and, as such, must be proven by expert testimony.” (Amadon v State of New York, 182 AD2d 955, 957 [3d Dept 1992]; see also Cruz v Alhambra Day Treatment Ctr., 2003 NY Slip Op 50909[U], *2 [App Term, 2d & 11th Jud Dists 2003]; Caulfield v Kitsap County, 108 Wash App 242, 257, 29 P3d 738, 745 [2001] [home care].) The issue is the “standard of care customarily exercised [by] similar facilities in the community.” (Yamin v Baghel, 284 AD2d 778, 779 [3d Dept 2001].)
There is a “complex, multifaceted reality of providing personal care services to those in need,” and a “home care assessment . . . requires complementary analyses and opinions from individuals with different fields of expertise.” (Kuppersmith v Dowling, 93 NY2d 90, 97 [1999].) In this case, the court has no information as to the availability or cost of additional care for mother Newton in the home, the practical availability of financial resources in the family or through government subsidy, or the alternatives to home care and the practical and financial availability of those alternatives.
 The most that can be said on this record, and in the exercise of “common sense and judgment,” is that the Newtons and Rockaway failed to see that mother Newton might require additional care, and, therefore, failed to make a fuller assessment of her needs and the means for meeting them. For Rock-away in particular this is more than it should find satisfactory. But this court cannot know what an appropriate conclusion to such an assessment would have been, or what mother Newton might have thought of it. The court is confident, however, without the assistance of expert testimony, that she would not *191 have chosen the discomfort and indignity she suffered on occasion when she was left alone. Although a monetary award for such consequences might well be justified under the law, the novelty of the issues and factual uncertainties caution against it in this case.
Judgment is awarded to defendants, dismissing the claim against them.