MILTON MEISELMAN, by FANNY MEISELMAN, His Guardian ad Litem, Appellant, *v.* CROWN HEIGHTS HOSPITAL, INC., et al., Respondents.

Submitted March 7, 1941; decided April 17, 1941..

*Dora Aberlin* for appellant.

*Thomas H. Clearwater* and *Lorenz J. Brosman* for respondents.

RIPPEY, J.   In the complaint plaintiff has set up four separate causes of action, three against the defendants individually and one against them jointly, for damages for personal injuries suffered by the plaintiff through negligence and malpractice which resulted in osteomyelitis and abandonment of his case before he was cured and while he was desperately ill and helpless.   Plaintiff furnished a bill of practiculars purporting to be in response to a demand that certain particulars of the allegations of the complaint be furnished.   So far as it goes, among other things, it purports to contain certain particulars of the claims of plaintiff against the defendant Schoolnik of negligence and malpractice and against the defendant hospital and the defendant Koster of negligence and malpractice in treatment and against all of the defendants of a premature discharge of the patient and abandonment of the case.   Since a demand for the bill is not in the record, it is impossible to say whether or not it places any limit on the pleadings. The course of the trial would seem to indicate that it did not.   Before plaintiff was given an opportunity by the trial judge to complete his proofs, on motion of defendants the court dismissed the complaint *on the merits*.   From a judgment making that dismissal effective, plaintiff appealed to the Appellate Division, where the judgment was affirmed. Upon the review in this court the facts must be viewed in the aspect most favorable to the plaintiff and every permissible inference from those facts in favor of plaintiff must be indulged (*Kraus* v. *Birnbaum*, 200 N. Y. 130, 133).

Among other things, the following facts briefly stated appeared in the record at the time the nonsuit was granted. The defendants Schoolnik and Koster were physicians licensed by the State of New York to practice their profession and the defendant hospital was a private institution operated for profit of which the defendant Koster was the chief of the surgical staff. The plaintiff, then a boy eight years of age, was kicked in the left knee by another boy in the latter part of November, 1931, and suffered an injury. Shortly afterwards the boy complained that his leg hurt and his father called a physician to attend him. The doctor diagnosed the trouble as a case of grippe and prescribed for his fever. The boy found no relief and the defendant Schoolnik was summoned to attend him. He examined the boy and stated that his situation was such that he was unable to treat him and suggested that the defendant Koster, a specialist, be called. Koster ordered immediate hospitalization and sent the boy to the defendant hospital. The boy was desperately ill and required a blood transfusion and Koster operated first on one leg and then on the other and encased both legs in plaster casts. The trouble was diagnosed by Koster as osteomyelitis, a pus-forming infection of the bone. The boy was at the hospital for a period of about eighteen weeks and the hospital bill amounted to approximately a thousand dollars upon which the father of the boy had been unable to pay more than $349. Since the father was unable to pay the balance of the bill after various continuing demands on the part of the defendants Koster and the hospital, the defendants discharged the boy from further hospitalization and the father took the boy home, although refusing at the time to deliver a release to the hospital authorities as demanded. At the time the boy went home he was not cured, he had casts on both legs and both legs had open wounds through which pus was draining through windows in the plaster casts and he still ran a high temperature. The father testified that the doctors told him that the boy did not need further hospitalization, that it was unnecessary to transfer him to a charitable hospital

and that defendant Schoolnik would take care of the boy at home under Koster's supervision and that Koster told him, in substance, that Schoolnik had seen the dressings made through the windows in the casts and was competent to handle the case. The father demurred from removing the boy from the hospital but was assured by the doctor that it was proper to keep the boy at home and that he would be given proper care and attention. He said that Schoolnik explained to him that it would be necessary to put dressings on the wounds once in each five days or a week and that he would come in and do the dressings. The evidence is undisputed that Schoolnik had never had a case of the kind before and that during the subsequent five weeks during which the boy remained at home he failed on any occasion to consult the defendant Koster. The boy was suffering intense pain and was crying on occasions. Schoolnik attempted to remove parts of the casts on account of the increasingly bad condition of the legs and while doing so caused lacerations and when the father protested and asked him whether that was the way they handled things at the hospital Schoolnik replied that it was not but that nevertheless it amounted to nothing and that the legs would heal up. Schoolnik admitted at the outset, as above stated, that he knew nothing about a case of the kind, was unable to treat it and for that reason had called in the specialist. After the boy had been at home for some five weeks, at the request of Schoolnik he was sent to the Kings County Hospital on May 2, 1932. Between that time and October 17, 1936, the boy was hospitalized and treated alternately at the Kings County Hospital and the Blythedale Institution. On the latter date he was returned to his home with instructions to return to the clinic regularly, where he was a patient until the time of the trial. At the time of the trial the boy was severely crippled, walked with a limp, and one of his legs was stiff.

Upon the trial Dr. Degenhardt, who supervised the treatment of the boy during the first few months that he was at the Kings County Hospital, was called as a witness.

The doctor testified that, when the boy was admitted, both of his legs were in casts from the knee joints down and the boy was running a temperature of 101°. He removed the casts and then found that the right ankle over the middle malleolus had a healed sinus, that there had been a long, deep wound over the entire length of the left tibia, that there was a sinus over the lower end of the left femur and that there were large open wounds which were dirty and had thick white crusts about them. He said that there was a moderate amount of thick, tenacious, purulent discharge from the region of the left tibia and that X-rays, subsequently taken, showed destruction of the proximal two-thirds of the left tibia. He diagnosed the condition as chronic osteomyelitis of the right tibia, left tibia and femur and indicated that it had existed prior to admission in an acute stage. The infectious process and drainage continued until about May 30th, when the improvement was so far advanced that the doctor put on new casts without drainage windows on both legs from the toes to the upper third of both thighs.

The records of the case from the defendant hospital were admitted in evidence on plaintiff's case, as was a portion of the testimony of the defendant physicians taken before trial.

On the record as it stood when the nonsuit was granted, plaintiff had made out a *prima facie* case on the issue of malpractice against the defendant physicians and of willful abandonment of his case against defendants Koster and the hospital. Sufficient evidence was presented to warrant a jury in awarding damages on those counts (*Carpenter* v. *Blake*, 75 N. Y. 12; *Pike* v. *Honsinger*, 155 N. Y. 201; *Benson* v. *Dean*, 232 N. Y. 52). At least, the jury might have found that the defendants had prematurely and willfully discharged themselves from attention to the case while the patient was desperately ill and before he was cured without giving information or advice as to subsequent treatment or the desperate and dangerous condition and character of the disease, all of which led to aggravation of his con-

dition and illness (*Benson* v. *Dean, supra*). Common sense and ordinary experience and knowledge, such as is possessed by laymen, without the aid of medical expert evidence, might properly have suggested to the jury that the condition of the boy at the time that he was left without hospitalization and abandoned by the defendants was not compatible with skillful treatment (*Benson* v. *Dean, supra*). That the plaintiff's parents were misled by the conduct of the physicians to the plaintiff's detriment is inferable from the facts adduced (*Carpenter* v. *Blake, supra*). Ordinarily, expert medical opinion evidence, based on suitable hypotheses, is required, when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact, to furnish the basis for a determination by a jury of unskillful practice and medical treatment by physicians; but where the matters are within the experience and observation of the ordinary jurymen from which they may draw their own conclusions and the facts are of such a nature as to require no special knowledge or skill, the opinion of experts is unnecessary (*Dougherty* v. *Milliken*, 163 N. Y. 527, 533; *Benson* v. *Dean, supra; Shaw* v. *Tague*, 257 N. Y. 193; *Finn* v. *Cassidy*, 165 N. Y. 584; *Harley* v. *Buffalo Car Mfg. Co.*, 142 N. Y. 31; *Schutz* v. *Union Ry. Co.*, 181 N. Y. 33). Notwithstanding that the burden of proof did not change, upon the record as left at the time the nonsuit was granted the burden of going forward with the case rested upon the defendants (*Benson* v. *Dean, supra*).

At the outset of the testimony of Dr. Degenhardt he stated that he produced the records of the hospital which had reference to the boy's case. Plaintiff's counsel offered them in evidence. Defendants' counsel objected to them as " incompetent, irrelevant and immaterial." The objection was sustained and exception taken. Thereupon that part of the records which bears the name of Dr. Degenhardt was offered. The same objection was made with the same ruling and the court announced that he would allow the witness to refer to the records for the purpose of refreshing

his recollection but excluded the records upon this ground: "You cannot have records when you have the witness present in court. That is the best evidence." Under section 374-a of the Civil Practice Act, "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of said act, transaction, occurrence or event, if the trial judge shall find that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event, or within a reasonable time thereafter. * * * The term business shall include business, profession, occupation and calling of every kind." No objection was made to the admission of the records on the ground that no proper foundation had been laid for their admission or on other than the general grounds stated. The blanket exclusion of the records by the court on the ground stated left plaintiff without proof on what may have been essential features of his case and relieved plaintiff from proceeding further with proof of facts essential to warrant their admission. As the case stood, the records should have been admitted in evidence and their exclusion was erroneous (*People* v. *Kohlmeyer*, 284 N. Y. 366).

Plaintiff called a physician as an expert. Upon the preliminary examination it appeared that he had been a licensed and practicing physician and surgeon of the State of New York since May 3, 1936; that he received his preliminary education in the Universities of Heidelberg and Munich in Germany; that he graduated in medicine in 1899; that he was engaged for a period of ten years in educational research after his graduation; that he was an assistant in the surgical clinic of the Universities of Heidelberg and Munich and thereafter chief surgeon at the hospital at Coburg, Germany, which had six hundred beds, for more than six years and was then surgeon for ten additional years on the staff of the Red Cross Hospital at Munich, Germany; that he

specialized in general surgery; that he had been, since coming to the United States, and still was connected with the Lenox Hills Hospital in New York; that while practicing in Germany he became familiar through the personal handling of hundreds of cases with the treatment of osteo-. myelitis and had also become familiar with its treatment throughout the world by reading the literature on the subject. At the end of the preliminary examination of the witness as to his qualifications, upon objection by defendants, he was not permitted to testify as an expert on the sole ground that he was not competent to testify as to the proper practice in America in 1932.

The nature of osteomyelitis and its cause and probable effect were proper subjects for testimony of a competent medical witness; the case on the subject of malpractice was one for the admission of expert testimony (*Finn* v. *Cassidy, supra; Jones* v. *Angell*, 95 Ind. 376, 378) and a showing was made that the witness was skilled in the profession to which the subject relates. It was shown that he had acquired that skill either from study, experience or observation. No precise rule has been formulated and applied as to the exact manner in which such skill and experience must be acquired. Long observation and actual experience, though without actual study of the subject, qualify a witness as an expert in that subject (*Slater* v. *Wilcox*, 57 Barb. 604). Likewise, a physician may qualify himself from study of the subject alone (*Slocovich* v. *Orient Mutual Ins. Co.*, 108 N. Y. 56; *People* v. *Benham*, 160 N. Y. 402, 441; *People* v. *Thacker*, 108 Mich. 652). The extent of the expert's qualifications is always a proper subject for the jury on the question of the weight to be given to his testimony (*Hoag* v. *Wright*, 174 N. Y. 36, 47). Residence alone neither bars a physician from testifying as an expert nor qualifies him so to do.

The prevailing rule is that the question of the qualification of a witness to testify as an expert is for determination, in his reasonable discretion, by the trial court, which discretion, when exercised, is not open to review unless in deciding the

question the trial court has made a serious mistake or committed an error of law or has abused his discretion (*Slocovich* v. *Orient Mutual Ins. Co., supra; Hoag* v. *Wright, supra; White* v. *McPherson,* 183 Mass. 533; *Inland & Seaboard Coasting Co.* v. *Tolson,* 139 U. S. 551, 559). It was error of law, to hold that the witness was disqualified to testify at all as an expert. Whether he was qualified to express an opinion as to whether the medical and surgical treatment of plaintiff by the defendant physicians was in accord with commonly accepted medical practice, upon the record now before us, we are not called upon to decide.

Other matters have been discussed which need no attention now in view of the determination reached on the points considered above.

The judgments should be reversed and a new trial granted, with costs in all courts to abide the event.

CONWAY, J. (concurring). I concur in the result. I dissent from that portion of the opinion which holds that the trial court was in error in not permitting Dr. Colmers to testify as an expert. The entire testimony of this witness is brief and I shall quote it:

" Direct Examination by Mr. Hertel: Q. Dr. Colmers, you are a regularly licensed and practicing physician and surgeon of the State of New York? A. That is right. Q. And you have been for how long? A. I am living three years in this country. * * * Q. Prior to that time, where did you obtain your preliminary education? A. In the Universities of Heidelberg and Munich in Germany. Q. In what year? A. I was assistant in 1899 until 1909. Ten years for educational research. Q. When did you graduate in medicine? A. 1899. Q. Tell us what institutions you were connected with since that time. A. I was assistant in the surgical clinic of the University of Heidelberg and of Munich, and then I was chief surgeon to the hospital at Coburg, in Germany, and have been for more than six years chief surgeon at the hospital of six hundred beds. Then I was surgeon for ten years on the staff of the Red Cross Hospital at Munich, Germany, on the hospital staff.

Q. Did you specialize in any particular form of medicine or surgery? A. General surgery. Q. Since you have come to the United States, with what hospitals have you been or are you now associated? A. With Lenox Hills Hospital. Q. Any other hospitals? A. No.

" By the Court: Q. When were you licensed in the State of New York? A. May 3, 1936.

" By Mr. Hertel: Q. Doctor, while you were practicing in Germany, were you then familiar with the treatment of osteomyelitis, not only in Germany but in *other countries* of the world? A. *Yes, I read about it in other countries*, and I have seen quite a lot of cases in Germany, too, because it is a frequent disease in this country. Q. Is there any difference in the treatment of osteomyelitis in Germany or in any other country? · A. No. Mr. Martin: I object to that. The Court: Objection sustained. The witness says he read about treatment in other countries. Mr. Hertel: I respectfully except. Q. Did they coincide with the treatments in Germany? Mr. Martin: I object to what he read as hearsay. The Court: Objection sustained. He has no personal knowledge, according to his own testimony, of· the treatment of this disease anywhere except possibly in Germany. Mr. Hertel: I respectfully except. May we have a talk with your Honor about this before we go any further? The Court: No, I will listen to your questions and I will rule immediately. I do not believe in bench conferences. Q. Doctor, are you familiar with the proper and competent treatment of osteomyelitis? Mr. Martin: I object to the form of that question, based upon his previous answer. The Court: It is too general. Objection sustained. Mr. Hertel: Exception. Q. Doctor, assuming that a boy eight years of age — The Court: Pardon me, Counselor, if I may. Doctor, in Germany during your practice there, how many cases of osteomyelitis did you treat personally? The Witness: I cannot tell you the exact number, but I am sure they were several hundreds. Mr. Hertel: The reason I wanted to speak to your Honor was, if your Honor is going to rule that this man is not competent to testify as to the

proper practice *in America in 1932*, then there is no sense in wasting any time in asking a long hypothetical question. Mr. Martin: I am going to object just on that ground. The Court: If such an objection is made, I will sustain the objection. Mr. Martin: I make such an objection. Mr. Hertel: I respectfully except. The Court: What may be recognized in some school of medicine or surgery somewhere else in the world I cannot allow to be testified to in a court of this State and country. Doctors practicing in the State of New York are not required to recognize any practice that may be in vogue anywhere else. They follow the practice in this State and this country. That is all they are responsible for. Foreign methods may be good or bad. We have got to take the judgment of our own surgeons and physicians right here as to their recognized, approved practice."

This was clearly not error. The defendant physicians impliedly represented to the plaintiff that they possessed and the law placed upon them the duty of possessing that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the *locality* in which they practiced. (*Pike* v. *Honsinger*, 155 N. Y. 201 at 209.)

LEHMAN, Ch. J., LOUGHRAN, FINCH and DESMOND, JJ., concur with RIPPEY, J.; CONWAY, J., concurs in result in separate opinion in which LEWIS, J., concurs.

Judgments reversed, etc.