OPINION AND ORDER
 

 GORENSTEIN, United States Magistrate Judge.
 

 In this diversity action, two former inmates of a federal community confinement center operated by defendant Correctional Services Corporation (“CSC”), a private company under contract with the federal Bureau of Prisons (“BOP”), brought suit alleging that CSC was negligent in hiring, retaining, training, and supervising an employee whom plaintiffs allege sexually abused them. CSC has now moved for summary judgment pursuant to Fed. R.Civ.P. 56. The parties have consented to disposition of this matter by a United States Magistrate Judge pursuant to 28
 
 *DLI
 
 U.S.C. § 636(c). For the reasons stated below, CSC’s motion is granted in part and denied in part.
 

 I.
 
 INTRODUCTION
 

 A.
 
 Factual Background
 

 In considering CSC’s motion for summary judgment, the Court accepts as true the plaintiffs’ version of the facts where supported by admissible evidence and draws all factual inferences in the plaintiffs’ favor.
 
 See, e.g., McPherson v. Coombe,
 
 174 F.3d 276, 280 (2d Cir.1999).
 
 [1]
 

 1.
 
 Le Marquis Community Correctional Center
 

 Le Marquis Community Correctional Center (“Le Marquis”) was a “halfway house” for federal and state prisoners who had not yet completed their prison terms.
 
 See
 
 Affidavit of Josette Nelson-Dabo in Support of Correctional Services Corporation’s Motion for Summary Judgment, dated November 18, 2003 (“Nelson-Dabo Aff.”) (reproduced in Notice of Motion, filed November 19, 2003 (Docket #47) (“Notice of Motion”)), ¶ 8. It was operated by CSC, a private company, pursuant to a written contract with the BOP and in accordance with guidelines set forth by the BOP.
 
 Id.; see
 
 Statement of Work, dated December 1992 (“BOP Statement of Work”) (reproduced as Exs. 13-17
 
 to PI.
 
 56.1).
 

 Plaintiffs Yvette Adorno and Stephanie Womble became residents at Le Marquis in August and September 1998, respectively. Deposition of Yvette Adorno, June 26, 2003 (“Adorno Dep.”) (reproduced in part as Ex. I to Nelson-Dabo Aff. and in part as Ex. 2 to PI. 56.1), at 11; Deposition of Stephanie Womble, July 3, 2003 (“Womble Dep.”) (reproduced in part as Ex. J to Nelson-Dabo Aff. and in part as Ex. 3 to PI. 56.1), at 7, 110-11. They claim that, after arriving at Le Marquis, they were sexually assaulted by Miguel Correa, an employee of CSC who worked at Le Marquis as Resident Advocate.
 
 See generally
 
 Further Amended Verified Complaint, filed January 7, 2003 (Docket # 25) (reproduced as Ex. A to Nelson-Dabo Aff.), ¶¶ 24, 26, 40, 42.
 

 2.
 
 Conduct Against Adorno
 

 On November 13,1998, at approximately 7:00 or 8:00 p.m., Adorno reported to Cor-rea’s office to discuss an infraction she had allegedly incurred. Adorno Dep. at 50, 53-54; PI. 56.1 ¶ 4. As Resident Advocate, one of Correa’s responsibilities was to investigate “incident reports” for each resident and to ensure that his or her rights were not being violated. Correctional Services Corporation Position Description: Resident Advocate (“Resident Advocate Job Description”) (reproduced as Ex. D to Nelson-Dabo Aff. and as Ex. 11 to PI. 56.1). Correa had a private office on the
 
 *DLII
 
 second floor of Le Marquis. Deposition of Josette Nelson-Dabo, July 31, 2003 (“Nelson-Dabo Dep.”) (reproduced in part as Ex. H to Nelson-Dabo Aff. and in part as Ex. 1 to PI. 56.1), at 50.
 

 While in Correa’s office, Adorno claims that Correa picked up her shirt, touched her breasts, made various inappropriate sexual comments, and initially refused to let her leave his office. Adorno Dep. at 66-70, 72. Adorno states that she was permitted to leave Correa’s office only because she had to be present in her room for roll-call at 9:00 p.m. but that he instructed her to return to his office immediately thereafter.
 
 Id.
 
 at 69-70, 72. At approximately 10:00 p.m., following roll-call, Adorno returned to Correa’s office.
 
 Id.
 
 at 76, 78. When Adorno returned, Correa allegedly kissed her and pushed his body up against hers.
 
 Id.
 
 at 84. Adorno claims that Correa let her leave only after she threatened to scream and promised not to report the incident.
 
 Id.
 

 Adorno did not report the incident to any CSC or BOP officials, including the Facility Administrator at Le Marquis, Jo-sette Nelson-Dabo.
 
 Id.
 
 at 76, 81, 101-02. The number to contact the BOP was posted throughout Le Marquis, including in the female recreation room and in the cafeteria. Nelson-Dabo Dep. at 58. In addition, a representative from the BOP had explained to the residents at an orientation meeting that if they were having problems with a CSC employee they should call the BOP directly. Nelson-Dabo Aff. ¶ 21. Adorno testified that she did not report the incident because Nelson-Dabo had threatened to return any resident who complained about conditions at Le Marquis to federal prison. Adorno Dep. at 101-02;
 
 accord
 
 Deposition of Susan Scainetti (“Scainetti Dep.”) (reproduced in part as Ex. 6 to PI. 56.1), at 104, 127-28 (testifying that Nelson-Dabo had made such threats and that Nelson-Dabo had sent a resident back to federal prison after that resident complained about conditions at Le Marquis). Adorno did tell another Le Marquis resident about the incident a day after it occurred. Adorno Dep. at 76, 93-94; Scainetti Dep. at 145-46.
 

 According to Adorno, this incident has caused her to experience anger, mood swings, feelings of distrustfulness toward men, and problems being intimate with men. Adorno Dep. at 127, 136-37. Ador-no has sought psychiatric counseling and therapy concerning these problems.
 
 Id.
 
 at 122-24, 141. According to one psychiatrist, Adorno suffers from post-traumatic stress disorder caused by Correa’s actions.
 
 See
 
 Psychiatric Evaluations, dated October 19, 2000 (“Adorno Psychiatric Evaluations”) (reproduced as Ex. 4 to PI. 56.1), at 10.
 

 3.
 
 Conduct Against Womble
 

 Womble was a resident at Le Marquis from the end of September 1998 through December 1998. Womble Dep. at 7-8, 83, 110-11. During her stay, she met with Correa in his office approximately 12 times to discuss various infractions.
 
 Id.
 
 at 130. Womble alleges that over the course of these meetings, Correa made various sexually inappropriate remarks.
 
 Id.
 
 at 131-34. On approximately three such occasions, Correa allegedly hugged Womble and placed his hands on her clothes over her breasts.
 
 Id.
 
 at 144-45. In addition, Womble states that Correa touched her buttocks on one occasion.
 
 Id.
 
 at 145, 150.
 

 After about the fifth such encounter, Womble told Ms. Arias, her Case Manager at Le Marquis and a CSC employee,
 
 see
 
 Nelson-Dabo Dep. at 26, that Correa had “been harassing me and putting his hands on me every time I go into his office,” Womble Dep. at 160. Pursuant to guide
 
 *DLIII
 
 lines established by the BOP, CSC had instituted procedures by which Case Managers were required to report to their supervisors incidents of alleged sexual abuse, even if these allegations were unsubstantiated.
 
 See
 
 Deposition of Jack Brown, September 26, 2003 (“Brown Dep.”) (reproduced in part as Ex. A to Def. Reply Mem. and in part as Ex. 9 to PI. 56.1), at 54-55; Nelson-Dabo Dep. at 60-62;
 
 see also
 
 BOP Statement of Work ch. 2, at p. 13, ¶ 6 (requiring that CSC report to the BOP any instance of sexual abuse by a CSC employee). At some point between her conversation with Womble and Thanksgiving Day 1998, Arias left her position at Le Marquis. Womble Dep. at 160. There is no evidence that Arias ever reported Womble’s complaint to her supervisors. Nelson-Dabo Dep. at 62.
 

 Womble alleges that, a day or two after Thanksgiving Day 1998, she was raped by Correa. Womble Dep. at 162-63. According to Womble, Correa called her into his office at approximately 8:30 p.m.
 
 Id.
 
 at 163, 177. Correa rose from his chair, walked to Womble, and kissed her.
 
 Id.
 
 at 178-80. Womble pushed him away, left his office, and went to a bathroom a few steps down the hall.
 
 Id.
 
 at 178-81. Cor-rea then entered the bathroom, grabbed Womble from behind, and raped her.
 
 Id.
 
 at 182-86. When leaving the bathroom, Correa told Womble not to say anything to Nelson-Dabo about the encounter or else Womble would be sent back to federal prison.
 
 Id.
 
 at 188-89.
 
 [2]
 

 Womble did not report the rape to Nelson-Dabo, to other Le Marquis officials, or to the police.
 
 Id.
 
 at 193, 218-19. She testified that she did not do so because Nelson-Dabo had threatened residents that if they engaged in any sexual activity or if they did not like the way Le Marquis was operated, they would be returned to federal prison.
 
 Id.
 
 at 193, 202-03. In addition, Womble testified that she believed these threats to be founded based on her recollection of an incident in which a resident voiced complaints and was subsequently docked various privileges.
 
 Id.
 
 at 155-56.
 

 Because of the rape and the others incidents with Correa, Womble states that she has suffered physical pain and emotional suffering.
 
 Id.
 
 at 179, 185, 187-88, 207-08, 224-25, 236. She has since been treated for chlamydia, a sexually transmitted disease that she states she did not have prior to the rape.
 
 Id.
 
 at 214-15. She has sought psychiatric counseling and therapy.
 
 Id.
 
 at 18, 225. According to one psychiatrist, Womble suffers from post-traumatic stress disorder caused by Correa’s sexual abuse and rape.
 
 See
 
 Psychiatric Evaluations, undated (‘Womble Psychiatric Evaluations”) (reproduced as Ex. 5 to PI. 56.1), at 37.
 

 
 *DLIV
 
 4.
 
 Hiring, Transfer, and Termination of Correa
 

 CSC hired Correa for the position of Resident Supervisor at Le Marquis on November 20, 1997. Brown Dep. at 18-19. CSC’s requirements for the position of Resident Supervisor, whose responsibilities essentially were to monitor and supervise the activities of residents, were a high school diploma or GED and one year of “supervisory experience in a human service field.” Position Description/Qualifications: Resident Supervisor (reproduced as Ex. 10 to PI. 56.1);
 
 see
 
 Nelson-Dabo Dep. at 20-21; Brown Dep. at 14.
 

 By March 10, 1998, Correa had been transferred to the position of Resident Advocate. Brown Dep. at 36-37. CSC’s requirements for the position of Resident Advocate were a high school diploma or GED and one year of “experience in [the] area of security.” Resident Advocate Job Description;
 
 see
 
 Brown Dep. at 33. In addition, applicants for the position had to successfully pass a security background investigation. Resident Advocate Job Description;
 
 see
 
 Nelson-Dabo Aff. ¶ 9. The BOP, which approved these requirements, conducted a background investigation on Correa prior to his transfer. Nelson-Dabo Aff. ¶¶ 9-10; Brown Dep. at 53-54. This cheek, which consisted of running Correa’s social security number and fingerprints, revealed that Correa had attended college and had not been convicted of any crimes. Nelson-Dabo Aff. ¶¶ 10-11.
 

 As Resident Advocate, Correa’s responsibilities included meeting privately with residents in his office to discuss confidential matters. Brown Dep. at 47-48. Cor-rea was required to attend — and did attend — an ethics class provided by CSC. Nelson-Dabo Dep. at 42-43; Nelson-Dabo Aff. ¶ 19. The class dealt with how a Resident Advocate should interact with residents to maintain a courteous relationship, how to avoid inappropriate behavior, and how to report any misconduct to management. Nelson-Dabo Dep. at 43; Nelson-Dabo Aff. ¶ 19.
 

 Correa’s alleged sexual abuse of Adorno and Womble was reported to Mark W. Jensen, a BOP official, at the end of December 1998 by other Le Marquis residents who learned of the abuse from Ador-no and Womble. Scainetti Dep. at 145-46; Deposition of Rosemarie Johnson (reproduced in part as Ex. 7 to PI. 56.1), at 248, 251, 278. Immediately upon learning of Correa’s alleged misconduct from the BOP, CSC interviewed Correa and the plaintiffs. Nelson-Dabo Aff. ¶ 24. After conducting its investigation, CSC terminated Correa on January 4, 1999.
 
 Id.; see
 
 Letter from Josette Nelson to Miguel Cor-rea, dated January 6, 1999 (reproduced as Ex. E to Nelson-Dabo Aff.), at 1.
 

 B.
 
 Procedural History
 

 Plaintiffs filed their original complaint in this action on November 9, 2001 and an amended complaint on November 13, 2001. On April 19, 2002, CSC moved to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6).
 
 See
 
 Notice of Motion, filed April 19, 2002 (Docket # 12). By Order dated December 18, 2002, the court denied CSC’s motion.
 
 Scainetti v. United States,
 
 2002 WL 31844920 (S.D.N.Y. Dec.18, 2002). In relevant part, the court held that plaintiffs’ claims were not barred by the applicable three-year statute of limitations or by government contractor immunity.
 
 See id.
 
 at *2-*4. The court did order plaintiffs to file a second amended complaint properly alleging diversity jurisdiction as the basis for jurisdiction,
 
 see id.
 
 at *2, which plaintiffs did on January 7, 2003.
 

 CSC has now moved for summary judgment under Fed.R.Civ.P. 56. For the rea
 
 *DLV
 
 sons stated below, CSC’s motion is granted in part and denied in part.
 

 II.
 
 SUMMARY JUDGMENT STANDARD
 

 A district court may grant summary judgment only if “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c);
 
 see Celotex Corp. v. Catrett, 477
 
 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue is one that “may reasonably be resolved in favor of either party.”
 
 Anderson v. Liberty Lobby, Inc., 477
 
 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it “might affect the outcome of the suit under the governing law.”
 
 Id.
 
 at 248, 106 S.Ct. 2505. Thus, a genuine issue of material fact exists “if ‘the evidence is such that a reasonable jury could return a verdict for the nonmoving party.’ ”
 
 Gayle v. Gonyea,
 
 313 F.3d 677, 682 (2d Cir.2002) (quoting
 
 Anderson, 477
 
 U.S. at 248, 106 S.Ct. 2505). When determining whether a genuine issue of material fact exists, all factual inferences must be drawn and all ambiguities resolved in favor of the nonmoving party.
 
 See, e.g., Savino v. City of New York,
 
 331 F.3d 63, 71 (2d Cir.2003) (citing
 
 Anderson, 477
 
 U.S. at 255, 106 S.Ct. 2505);
 
 McPherson,
 
 174 F.3d at 280. However, “[cjonclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact.”
 
 Kerzer v. Kingly Mfg.,
 
 156 F.3d 396, 400 (2d Cir.1998) (citation omitted);
 
 accord Harlen Assocs. v. Incorporated Vill. of Mineola,
 
 273 F.3d 494, 499 (2d Cir.2001).
 

 “In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy [its] burden by pointing to an absence of evidence to support an essential element of the nonmoving party’s claim.”
 
 Vann v. City of New York,
 
 72 F.3d 1040, 1048 (2d Cir.1995) (citing
 
 Celotex, 477
 
 U.S. at 322-23, 106 S.Ct. 2548). “A defendant moving for summary judgment must prevail if the plaintiff[s] fail[ ] to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to [their] case.”
 
 Allen v. Cuomo,
 
 100 F.3d 253, 258 (2d Cir.1996) (citing
 
 Anderson, 477
 
 U.S. at 247-48, 106 S.Ct. 2505);
 
 accord Nebraska v. Wyoming,
 
 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993);
 
 Chase Manhattan Bank v. Am. Nat'l Bank & Trust Co. of Chi.,
 
 93 F.3d 1064, 1072 (2d Cir.1996).
 

 III.
 
 DISCUSSION
 

 CSC has moved for summary judgment on the following grounds: (1) plaintiffs cannot establish a prima facie case of negligence because they have not presented an expert to testify as to the standard of care required for the operation of a correctional halfway house and whether CSC deviated from that standard; (2) CSC cannot be vicariously hable for Correa’s alleged actions because they were taken outside the scope of his employment; (3) no claim of negligent hiring or retention can lie because the BOP conducted a background check on Correa and because CSC had no notice of Correa’s alleged actions or his propensity to commit such actions until the end of December 1998, when CSC states it first learned of Correa’s alleged sexual abuse of Adorno and Womble and at which time CSC immediately terminated Correa; (4) CSC’s alleged negligence was not a proximate cause of plaintiffs’ injuries; and (5) CSC is entitled to government contractor immunity.
 
 See
 
 Def. Mem. at 7-19;
 
 see also
 
 Nelson-Dabo Aff. ¶¶ 3-5.
 

 
 *DLVI
 
 The parties’ briefs assume that New York law applies to this matter and this “ ‘implied consent ... is sufficient to establish choice of law.’ ”
 
 Krumme v. West-Point Stevens Inc.,
 
 238 F.3d 133, 138 (2d Cir.2000) (quoting
 
 Tehran-Berkeley Civil & Envtl. Eng’rs v. Tippetts-Abbett-McCarthy-Stratton,
 
 888 F.2d 239, 242 (2d Cir.1989)).
 

 A.
 
 Requirement of Expert Testimony
 

 CSC contends that in order for plaintiffs to establish a prima facie case of negligence, expert testimony is necessary “concerning the standard(s) of care that CSC was responsible for and how CSC departed from those standards.” Def. Mem. at 7. Specifically, CSC avers that “[standards such as proper hiring and recruitment practices, ethics training, courses provided by CSC and the BOP, and the proper physical layout of offices at Le Marquis are outside the ken of the ordinary juror and must be established through expert testimony.”
 
 Id.
 
 at 8. Because plaintiffs have submitted no expert testimony, CSC argues that summary judgment is appropriate.
 
 See id.;
 
 Def. Reply Mem. at 4-5.
 

 If a plaintiff cannot establish a prima facie case without the benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate.
 
 See, e.g., Grassel v. Albany Med. Ctr. Hosp.,
 
 223 A.D.2d 803, 805, 636 N.Y.S.2d 154 (3d Dep’t 1996). However, under New York law, expert testimony is required only where “ ‘the subject-matter to be inquired about is presumed not to be within common knowledge and experience.’ ”
 
 Fane v. Zimmer, Inc.,
 
 927 F.2d 124, 131 (2d Cir.1991) (quoting
 
 Meiselman v. Crown Heights Hosp.,
 
 285 N.Y. 389, 396, 34 N.E.2d 367 (1941)). Where a matter is “ ‘within the experience and observation of the ordinary jurymen from which they may draw their own conclusions and the facts are of such a nature as to require no special knowledge or skill,’ ” expert testimony is not required.
 
 Id.
 
 (quoting
 
 Meiselman,
 
 285 N.Y. at 396, 34 N.E.2d 367).
 

 CSC has cited no New York case to support their contention that expert testimony would be required for plaintiffs to establish a prima facie case of negligence. The cases cited by CSC for this proposition involve circumstances far different from those in this case. Some deal with the evidence necessary for a plaintiff to prevail in a medical malpractice action.
 
 See Lasek v. Nachtigall,
 
 189 A.D.2d 749, 750, 592 N.Y.S.2d 420 (2d Dep’t 1993);
 
 Amadon v. State,
 
 182 A.D.2d 955, 956-57, 582 N.Y.S.2d 539 (3d Dep’t 1992);
 
 Jacobs v. Newton,
 
 1 Misc.3d 171, 768 N.Y.S.2d 94, 103, 107-09 (2003);
 
 Cruz v. Alhambra Day Treatment Ctr.,
 
 2003 WL 21436353, at *1 (N.Y. Apr. 17, 2003). These cases are obviously irrelevant since “[t]he distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of the facts.”
 
 Miller v. Albany Med. Ctr. Hosp.,
 
 95 A.D.2d 977, 978, 464 N.Y.S.2d 297 (3d Dep’t 1983) (citations omitted). Indeed, expert testimony is required by statute in New York for certain medical malpractice actions.
 
 See
 
 N.Y. C.P.L.R. 4401-a.
 

 The two remaining New York cases cited by
 
 CSC
 
 —Thomas
 
 v. City of Auburn,
 
 217 A.D.2d 934, 629 N.Y.S.2d 585 (4th Dep’t 1995), and
 
 Chanter v. Manocherian,
 
 151 A.D.2d 432, 543 N.Y.S.2d 671 (1st Dep’t 1989) — are likewise inapposite.
 
 Thomas
 
 held only that a trial court could
 
 *DLVII
 
 permit an expert to testify regarding whether police officers were reasonable in leaving unprotected an individual who was threatened with death and subsequently killed after the officers left him alone.
 
 See
 
 217 A.D.2d at 934, 936, 629 N.Y.S.2d 585. Similarly,
 
 Chanler
 
 held merely that an expert should have been permitted to testify as to “the common standards and requirements applicable to the placement of barriers in a public passageway.” 151 A.D.2d at 434-35, 543 N.Y.S.2d 671. Another case cited by
 
 CSC
 
 —Robinson
 
 v. United States Bureau of Prisons,
 
 244 F.Supp.2d 57 (N.D.N.Y.2003)—is irrelevant because it arose not under New York law but under 42 U.S.C. § 1983 as an Eighth Amendment claim.
 
 See id.
 
 at 62. Even so,
 
 Robinson
 
 held only that the mere fact that one officer was stationed in a common area to supervise 219 inmates was by itself insufficient to demonstrate that the prison guards were made aware of an excessive risk to the inmates’ safety.
 
 See id.
 
 at 64-65. The court made clear that non-expert testimony — -such as rules and regulations regarding prison staffing — would have been permissible to make this showing.
 
 See id.
 
 at 65 (permitting the showing to be made by additional evidence, whether “expert or otherwise”).
 

 The remaining case law cited by CSC comes from the District of Columbia courts.
 
 See
 
 Def. Mem. at 7-8 (citing
 
 Phillips v. District of Columbia,
 
 714 A.2d 768 (D.C.1998);
 
 Hughes v. District of Columbia,
 
 425 A.2d 1299 (D.C.1981);
 
 Morton v. Burns,
 
 No. 01 CA 6368 (Super.Ct.D.C. Mar. 20, 2003) (annexed to Def. Mem.)). As reflected in
 
 Clark v. District of Columbia,
 
 708 A.2d 632, 634 (D.C.1997), the District of Columbia’s highest court has “repeatedly held that the standard of care owed by the District of Columbia to persons in its custody is a matter beyond the ken of the average juror that requires expert testimony.” No such rule exists in New York, however, and there is thus no basis for this Court to conclude that a New York court would decide that the standard of care owed to persons in custody must in all circumstances be considered “beyond the ken of the average juror.” Thus, we decline to follow the rule articulated in the District of Columbia cases.
 

 With respect to the negligent retention claim in this case, for example, a lay juror could reasonably determine without expert testimony that CSC should not have retained Correa if CSC had been placed on notice that he had engaged in sexual misconduct with the residents of Le Marquis under the circumstances alleged here. Indeed, it would be difficult to imagine that there exists an expert who would testify that it would be appropriate to retain Cor-rea if CSC actually was aware of Correa’s behavior. Thus, the jury will not be asked to decide some matter beyond its experience but instead will decide — assuming it believes that Womble did in fact tell Arias about Correa’s actions and that CSC was thereby put on notice of Correa’s conduct — whether CSC’s retention of Correa deviated from the appropriate standard of care owed to plaintiffs. Such a judgment is capable of being made by laypersons. Accordingly, CSC is not entitled to summary judgment merely because there is no expert evidence in the record.
 
 [3]
 

 
 *DLVIII
 
 B.
 
 CSC’s Vicarious Liability
 

 CSC states that “Correa’s alleged sexual misconduct was clearly outside the scope of his duties as [Resident Advocate] and the alleged conduct clearly did not serve any legitimate business purpose.” Def. Mem. at 11. Thus, CSC argues that it cannot be held vicariously liable for Cor-rea’s actions because they were taken outside the scope of his employment.
 
 See id.
 
 at 9-11; Def. Reply Mem. at 5-7.
 

 The doctrine of respondeat superior “renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment.”
 
 Riviello v. Waldron,
 
 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979) (citations omitted). However, “[a]n employer will not be held liable under this doctrine for actions which were not taken in furtherance of the employer’s interests and which were undertaken by the employee for wholly personal motives.”
 
 Galvani v. Nassau County Police Indemnification Review Bd.,
 
 242 A.D.2d 64, 68, 674 N.Y.S.2d 690 (2d Dep’t 1998) (citations omitted). Nevertheless, an employer is not excused from liability “merely because [its] employees, acting in furtherance of [its] interests, exhibit human failings and perform negligently or otherwise than in an authorized manner.”
 
 Riviello,
 
 47 N.Y.2d at 302, 418 NY.S.2d 300, 391 N.E.2d 1278. Instead, the test is “whether the act was done while the servant was doing his master’s work, no matter how irregularly, or with what disregard of instructions.”
 
 Id.
 
 (internal quotation marks and citation omitted).
 

 To be held vicariously liable, an “employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected.”
 
 Id.
 
 at 304, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (citation omitted). Thus, “[w]here the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment.”
 
 Pizzuto v. County of Nassau,
 
 239 F.Supp.2d 301, 313 (E.D.N.Y.2003) (citing
 
 Riviello,
 
 47 N.Y.2d at 305, 418 N.Y.S.2d 300, 391 N.E.2d 1278). This determination “is heavily dependent on factual considerations and is therefore ordinarily a question for the jury.”
 
 Id.; accord Riviello,
 
 47 N.Y.2d at 303, 418 N.Y.S.2d 300, 391 N.E.2d 1278. However, where there is no conflicting evidence as to the material facts, a court may make this determination as a matter of law.
 
 See Salvatore v. KLM Royal Dutch Airlines,
 
 1999 WL 796172, at *5 (S.D.N.Y. Sept.30, 1999);
 
 Cepeda v. Coughlin,
 
 128 A.D.2d 995, 997, 513 N.Y.S.2d 528 (3d Dep’t 1987).
 

 The Court of Appeals of New York has set forth the following guidelines for determining whether tortious acts have been committed within the scope of employment:
 

 [1] the connection between the time, place and occasion for the act, [2] the history of the relationship between employer and employee as spelled out in actual practice, [3] whether the act is one commonly done by such an employee, [4] the extent of departure from normal methods of performance, [and][5] whether the specific act was one that the employer could reasonably have anticipated.
 

 Haybeck v. Prodigy Servs. Co.,
 
 944 F.Supp. 326, 329 (S.D.N.Y.1996) (citing
 
 Riviello,
 
 47 N.Y.2d at 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278);
 
 see also Mingo v. United States,
 
 274 F.Supp.2d 336, 346 (E.D.N.Y.2003) (“While all five factors are considered, New York courts generally place greater emphasis on the fifth factor, namely, whether the acts involved ...
 
 *DLIX
 
 could reasonably have been anticipated by [the] employer.” (citation omitted)).
 

 After applying these factors and accepting as true all of plaintiffs’ evidence, the Court concludes that no reasonable jury could find that Correa’s actions were within the scope of his employment. Of the above five factors, the only one that arguably favors the plaintiffs is the first — “the connection between the time, place and occasion for the act.” This is because the “time, place and occasion for the act” show that Correa’s status as a CSC employee in the position of Resident Advocate enabled him to commit the alleged sexual assault. Plaintiffs have testified that they were sexually assaulted after being required to report to Correa’s private office as part of CSC’s process for reviewing alleged infractions. Thus, there was a connection between the time, place, and occasion for the act and Correa’s employment.
 

 There is no evidence in the record concerning the second factor. The third and fourth factors, however, clearly favor CSC. Plaintiffs do not dispute that the act of sexual abuse and/or rape is not one that is commonly done by a Resident Advocate; nor do they dispute that Correa’s actions substantially departed from normal methods of performance.
 

 The Court turns now to the fifth factor, which “New York courts generally place greater emphasis on ..., namely, whether the acts involved ... could reasonably have been anticipated by [the] employer,”
 
 Mingo,
 
 274 F.Supp.2d at 346. Employers have been found vicariously liable for an intentional assault where the nature of the employee’s duties made it foreseeable that such an assault would take place.
 
 See, e.g., Sims v. Bergamo,
 
 3 N.Y.2d 531, 534-36, 169 N.Y.S.2d 449, 147 N.E.2d 1 (1957) (assault of unruly patron by bartender to protect employer’s property and to maintain order on premises was within the scope of bartender’s employment);
 
 Cepeda,
 
 128 A.D.2d at 997, 513 N.Y.S.2d 528 (where prison guards used allegedly excessive force in returning inmates to their cells after a fight, actions held to be within the scope of their employment since “[custody and control of inmates and the maintenance of prison safety and security are the primary duties and responsibilities of correction officers”). Here, however, the nature of Correa’s duties as Resident Advocate in no way mandated any kind of physical contact, let alone sexually oriented physical contact.
 

 Because tortious sexual activity generally is entirely divorced from the nature of an employment position, “New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and , do not further an employer’s business, even when committed within the employment context.”
 
 Ross v. Mitsui Fudosan, Inc.,
 
 2 F.Supp.2d 522, 531 (S.D.N.Y.1998) (citing cases). Thus, New York courts have repeatedly found no vicarious liability for claims involving sexual misconduct, including sexual assault.
 
 See, e.g., Joshua S. v. Casey,
 
 206 A.D.2d 839, 839, 615 N.Y.S.2d 200 (4th Dep’t 1994) (sexual abuse of a child by a priest);
 
 Kirkman v. Astoria Gen. Hosp.,
 
 204 A.D.2d 401, 402, 611 N.Y.S.2d 615 (2d Dep’t 1994) (rape of child patient by hospital security guard);
 
 Koren v. Weihs,
 
 190 A.D.2d 560, 560-61, 593 N.Y.S.2d 222 (1st Dep’t 1993) (hospital psychotherapist who engaged in “sex therapy” with a patient);
 
 see also Haybeck,
 
 944 F.Supp. at 330 (collecting cases).
 

 The applicability of these principles is not altered merely because CSC allegedly had notice of Correa’s propensity to commit sexual acts through Womble’s complaint to Arias. As the Second Circuit has explained:
 

 
 *DLX
 
 [W]hat is reasonably foreseeable in the context of respondeat superior is quite a different thing from the foreseeably .unreasonable risk of harm that spells negligence. When we talk of vicarious liability we are not looking for the employer’s fault but rather for risks that may fairly be regarded as typical of or broadly incidental to the enterprise [the employer] has undertaken.
 

 Cronin v. Hertz Corp.,
 
 818 F.2d 1064, 1068 (2d Cir.1987) (internal quotation marks and citations omitted) (discussing general principles of vicarious liability in the context of a case arising under Connecticut law). In other words, while Womble’s complaint to Arias is relevant to CSC’s liability for negligence (as discussed below), it is not a consideration in determining whether CSC is vicariously liable for Correa’s actions.
 
 [4]
 

 Because the factors applicable to the doctrine of vicarious liability favor CSC, the Court grants it summary judgment with respect to this issue.
 

 C.
 
 CSC’s Direct Liability for Negligence
 

 “Even where an employee does not act within the scope of his employment, ‘an employer may be required to answer in damages for the tort of an employee against a third party when the employer has either hired or retained the employee with knowledge of the employee’s propensity for the sort of behavior which caused the injured party’s harm.’ ”
 
 Haybeck,
 
 944 F.Supp. at 332 (quoting
 
 Kirkman,
 
 204 A.D.2d at 403, 611 N.Y.S.2d 615). “A cause of action for negligent hiring or retention requires allegations that the employer ‘knew or should have known of the employee’s propensity to commit injury,’ or the employer failed to investigate a prospective employee notwithstanding knowledge of ‘facts that would lead a reasonably prudent person to investigate that prospective employee.’ ”
 
 Sheila C. v. Povich,
 
 2 Misc.3d 315, 768 N.Y.S.2d 571, 580 (2003) (quoting
 
 T.W. v. City of New York,
 
 286 A.D.2d 243, 245, 729 N.Y.S.2d 96 (1st Dep’t 2001)).
 

 CSC argues that it is entitled to summary judgment on plaintiffs’ claims of negligent hiring and negligent retention.
 
 See
 
 Def. Mem. at 11-13; Def. Reply Mem. at 7-9. We deal with each claim in turn.
 

 1.
 
 Negligent Hiring
 

 CSC argues that it could not have been negligent in hiring Correa because the BOP’s background check and CSC’s interview process “did not place CSC on notice of any potential propensity Correa might have had for violence or sexual abuse.” Def. Mem. at 12. Plaintiffs do not argue that the background check was somehow inadequate or that there is any evidence in the record that CSC should have been on notice of any propensity Correa might have had for violence or sexual abuse prior to his transfer to the position of Resident Advocate. Instead, plaintiffs’ argument is that CSC was negligent in transferring Correa to the position of Resident Advocate without his having
 
 *DLXI
 
 met CSC’s own requirement for the position: possessing one year of “experience in [the] area of security.”
 
 See
 
 PL Mem. at 6-7.
 

 The Court will assume,
 
 arguendo,
 
 that Correa did not possess the necessary experience and that the failure by CSC to adhere to the one-year security experience requirement could constitute negligence on its part. The problem with plaintiffs’ argument is that, even under these assumptions, CSC is still entitled to summary judgment because plaintiffs have not demonstrated how this negligence proximately caused any of their harm.
 
 See, e.g., Borden v. Capital Dist. Transp. Auth.,
 
 307 A.D.2d 1059, 1061, 763 N.Y.S.2d 860 (3d Dep’t 2003) (liability for negligent hiring exists only where the employer hired the employee with knowledge of the propensity that caused the injured party’s harm (citing
 
 Detone v. Bullit Courier Serv., Inc.,
 
 140 A.D.2d 278, 279, 528 N.Y.S.2d 575 (1st Dep’t 1988))).
 

 Plaintiffs argue that “[s]ecurity experience was obviously required because the Resident Advocate ... asserted extensive authority over residents, including of the opposite sex, in a confidential setting.” PI. Mem. at 6;
 
 see also id.
 
 at 7 (the security experience requirement “served to protect residents from potential abuse by their Resident Advocate” and CSC “should have known that an individual lacking qualifications for the position of Resident Advocate could lack the restraint to confidentially deal with residents and not sexually abuse them”). No reasonable jury, however, could conclude that Correa’s lack of having one-year security experience proximately caused the plaintiffs’ harm. There is no reason to believe that “experience in [the] area of security” means anything other than its normal meaning: experience protecting persons or property from harm by others — not from harm caused by the very person performing the security function. As plaintiffs tacitly admit elsewhere in their argument, this is a case about an abuse of supervisory authority.
 
 See id.
 
 at 5 (“[CSC] designated [Correa] as plaintiffs’ supervisor and, in doing so, vested its own authority in him.... Thus, it was [Cor-rea’s] threats of wielding the authority which [CSC] conferred, and returning plaintiffs to federal prison, that allowed him to sexually abuse both plaintiffs and rape [Womble].”). There is no causal contention between Correa’s alleged lack of security experience and the abuse of his supervisory authority over the residents. Accordingly, CSC is entitled to summary judgment on plaintiffs’ negligent hiring claims.
 

 2.
 
 Negligent Retention
 

 CSC argues that it is entitled to summary judgment on plaintiffs’ negligent retention claims because it had no notice of Correa’s alleged actions or his propensity to commit such actions until the alleged rape of Womble was reported to CSC by the BOP, at which time CSC immediately conducted an investigation and terminated Correa.
 
 See
 
 Def. Mem. at 12-13; Def. Reply Mem. at 8-9.
 

 As noted, an employer is “ ‘required to answer in damages for the tort of an employee against a third party when the employer has ... retained the employee with knowledge of the employee’s propensity for the sort of behavior which caused the injured party’s harm.’ ”
 
 Haybeck,
 
 944 F.Supp. at 332 (quoting
 
 Kirkman,
 
 204 A.D.2d at 403, 611 N.Y.S.2d 615). Here, there is evidence that Womble told Arias that Correa had “been harassing me and putting his hands on me every time I go into his office.” Womble Dep. at 160. Womble’s report came “a couple of weeks” after her arrival at Le Marquis in September 1998,
 
 id.,
 
 and thus preceded the al
 
 *DLXII
 
 leged rape by Correa near Thanksgiving Day 1998 and the alleged sexual abuse of Adorno on November 13, 1998. A jury would be entitled to conclude that the report to Arias put CSC on notice of “the sort of behavior which caused the injured party’s harm.”
 
 Compare Kenneth R. v. Roman Catholic Diocese of Brooklyn,
 
 229 A.D.2d 159, 164, 166, 654 N.Y.S.2d 791 (2d Dep’t) (that child plaintiffs told certain priests about the sexual abuse they were suffering at the hands of another priest was sufficient to withstand defendant’s motion to dismiss plaintiffs’ negligent retention and negligent supervision claims),
 
 cert. denied,
 
 522 U.S. 967, 118 S.Ct. 413, 139 L.Ed.2d 316 (1997),
 
 with Kirkman,
 
 204 A.D.2d at 403, 611 N.Y.S.2d 615 (employer of security guard accused of raping a child hospital patient was not liable for negligent hiring or retention where there was no showing that the employer had any knowledge of the security guard’s propensity or history of such misconduct). While CSC complains that the only evidence in the record of Womble’s report to Arias is Womble’s own testimony,
 
 see
 
 Def. Reply Mem. at 10, this testimony is enough to create a genuine issue of fact as to whether that report occurred. Accordingly, CSC is not entitled to summary judgment on plaintiffs’ negligent retention claims.
 

 D.
 
 Lack of Proximate Cause as to Damages
 

 In a particularly distasteful argument, CSC argues that “[considering plaintiffs’ background of mental and physical abuse it is difficult to even comprehend that any alleged conduct by Correa could have been a substantial factor or proximate cause of plaintiffs’ alleged injuries.” Def. Mem. at 14. In support, CSC cites to testimony by the plaintiffs showing that “physical and mental damage was inflicted upon [them] throughout their lives by boyfriends, spouses, or family members.”
 
 Id.
 
 CSC thus concludes that none of Correa’s alleged conduct, if imputed to CSC by its negligence, could have contributed to plaintiffs’ current physical and mental states.
 
 Id.
 
 at 16.
 

 CSC cites no support for the proposition that an individual who already has injuries is incapable of suffering additional injuries. Moreover, the proposition is absurd on its face. Plaintiffs have testified to the physical pain and/or emotional distress that resulted from Correa’s alleged actions.
 
 See
 
 Adorno Dep. at 127, 136-37; Womble Dep. at 179, 185, 187-88, 207-08, 224-25, 236. Womble has since been treated for chlamydia, a sexually transmitted disease that she states she did not have prior to the rape. Womble Dep. at 214-15. In addition, a psychiatrist has reported that both plaintiffs suffer from post-traumatic stress disorder caused by Correa’s sexual abuse.
 
 See
 
 Adorno Psychiatric Evaluations at 10; Womble Psychiatric Evaluations at 37. Plaintiffs have thus put forth sufficient evidence for a jury to conclude that Cor-rea’s actions proximately caused them harm.
 

 E.
 
 Government Contractor Immunity
 

 Finally, CSC argues that summary judgment should be granted on all of plaintiffs’ claims because it is entitled to government contractor immunity.
 
 See
 
 Def. Mem. at 16-19. Under this doctrine, where “a private party has contracted with the federal government to carry out a project on behalf of the government, then that private party, like the federal government, is shielded from liability under the doctrine of sovereign immunity.”
 
 Norwood v. Esmor, Inc.,
 
 1997 WL 65913, at *4 (S.D.N.Y. Feb.13, 1997) (citing
 
 Yearsley v. W.A. Ross Constr. Co.,
 
 309 U.S. 18, 19, 60 S.Ct. 413, 84 L.Ed. 554 (1940)).
 

 
 *DLXIII
 
 Government contractor immunity originally developed in the context of whether private contractors would be held liable for design defects in government-commissioned military equipment. In
 
 Boyle v. United Technologies Corp.,
 
 the Supreme Court held that “Pliability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.” 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The Court reasonéd that the “selection of the appropriate design for military equipment” involved “judgment as to the balancing of many technical, military, and even social considerations” that should not be “second-guess[ed] ... through state tort suits against contractors” carrying out the design specifications of the federal government.
 
 Id.
 
 at 511, 108 S.Ct. 2510 (internal quotation marks and citation omitted).
 

 CSC argues that it is entitled to government contractor immunity because it “performed all of its functions with regard to hiring, supervising and training its employees in accordance with the BOP’s contract and the specifications, policies and procedures, which the BOP specifically required, commented on, revised, and approved.” Def. Mem. at 16-17. However, even assuming that government contractor immunity would be applicable outside of the military context,
 
 see In re Chateaugay Corp.,
 
 146 B.R. 339, 351 (S.D.N.Y.1992) (limiting government contractor immunity to the military context);
 
 cf. Scainetti,
 
 2002 WL 31844920, at *3 n. 1 (“The U.S. Court of Appeals for the Second Circuit has not addressed whether the government contractor defense is applicable in non-military contexts.”), the requirements necessary for its application have not been met in this case.
 

 “The government contractor defense only shields a government contractor from claims arising out of its actions where the government has exercised its discretion and judgment in approving precise specifications to which the contractor must adhere.”
 
 Malesko v. Corr. Servs. Corp.,
 
 229 F.3d 374, 382 (2d Cir.2000),
 
 rev’d on other grounds,
 
 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001);
 
 see Malesko,
 
 534 U.S. at 74 n. 6, 122 S.Ct. 515 (government contractor immunity is appropriate “[w]here the government has directed a contractor to do the very thing that is the subject of the claim”);
 
 Densberger v. United Techs. Corp.,
 
 297 F.3d 66, 75 (2d Cir.2002) (“The affirmative defense applies only if the government exercised significant control over the relevant actions of the contractor.”),
 
 cert. denied,
 
 537 U.S. 1147, 123 S.Ct. 876, 154 L.Ed.2d 849 (2003). “Stripped to its essentials,” government contractor immunity claims that “[t]he Government made me do it.”
 
 In re Joint E. & S. Dist. N.Y. Asbestos Litig.,
 
 897 F.2d 626, 632 (2d Cir.1990).
 

 Here, although the BOP issued specifications to which CSC had to adhere, it is not these specifications that are the subject of plaintiffs’ claims. The acts that plaintiffs allege demonstrate CSC’s negligence — most obviously, the failure to discharge Correa after Womble allegedly reported his improper conduct to Arias— were not mandated by the BOP. Even plaintiffs’ claim that CSC’s training practices were deficient could not be subject to a government contractor immunity defense. While the BOP may have required that CSC institute some training practices,
 
 see
 
 Nelson-Dabo Aff. ¶¶ 19-21, nothing stopped CSC from instituting more stringent training practices. Moreover, CSC
 
 *DLXIV
 
 has put forth no evidence that the BOP subsequently ratified CSC’s particular training practices.
 
 See Lewis v. Babcock Indus., Inc.,
 
 1992 WL 142751, at *5 (S.D.N.Y. June 8, 1992) (“[GJovernment performance specifications are sufficient to establish approval, provided that the government subsequently reviewed and approved the design chosen by the private contractor.... Rubber stamping does not constitute approval because the contractor, not the government, must exercise discretion over the design feature.” (citations omitted)),
 
 aff'd,
 
 985 F.2d 83 (2d Cir.),
 
 cert. denied,
 
 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993).
 

 In sum, CSC is not entitled to government contractor immunity.
 

 Conclusion
 

 CSC’s motion for summary judgment (Docket #47) is granted in part and denied in part. Plaintiffs may not assert at trial any theory of vicarious liability. Also, their negligent hiring claims are dismissed. CSC’s motion is denied in all other respects.
 

 [1]
 

 . CSC argues in its reply brief that "[a]ll facts in CSC’s Rule 56.1 [statement] should be admitted into evidence” because "[a] proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint.” Defendant Correctional Services Corporation’s Brief in Further Support of Its Motion for Summary Judgment, filed February 10, 2004 (Docket # 57) ("Def. Reply Mem.”), at 2. The iteration of Local Civ. R. 56.1 in effect at the time of the filing of plaintiffs’ opposition papers, however, required only that the party opposing summary judgment submit "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.” Plaintiffs have met this requirement.
 
 See
 
 Statement of Plaintiffs Yvette Adorno and Stephanie Womble Pursuant to Rule 56.1(a) [sic] of the Rules of the United States District Court for the Southern District of New York, filed January 5, 2004 (Docket
 
 #
 
 55) (“Pl.56.1”).
 

 [2]
 

 . As CSC points out,
 
 see
 
 Defendant Correctional Services Corporation's Brief in Support of Its Motion for Summary Judgment, filed November 19, 2003 (Docket #49) ("Def. Mem.”), at 6, Womble’s account of the incident at her deposition is at odds with her earlier account to the BOP's investigating officer. According to the BOP report, the encounter occurred inside Correa's office, not in the bathroom outside of his office.
 
 See
 
 Report, undated ("Report”) (reproduced as Ex. G to Nelson-Dabo Aff.), at 1. More significantly, the BOP report makes no mention of any claim by Womble that Correa raped her or otherwise engaged in sexual intercourse with her.
 
 See id.; see also
 
 Deposition of Mark W. Jensen, September 24, 2003 (reproduced in part as Ex. K to Nelson-Dabo Aff.), at 23 (testimony of the BOP's investigating officer: “Q. If [Womble] had mentioned [that she was raped] during the interview, that would have been included in the report, is that correct? A. That’s correct.”). Rather, the BOP report states that Correa made sexual propositions, grabbed Womble, and kissed her.
 
 See
 
 Report at 1.
 

 [3]
 

 . Because plaintiffs' negligent hiring claim is being dismissed on other grounds,
 
 see
 
 Section III.C.l below, it is not necessary to reach the issue of whether expert testimony would be required with respect to this claim. As for plaintiffs' claims of negligent supervision and negligent training, CSC has made no arguments with respect to the sufficiency of the existing evidence in the record on these claims and thus we do not consider whether expert testimony would be required for these additional claims.
 

 [4]
 

 . Plaintiffs' reliance on Title VII case law regarding vicarious liability for the creation of a hostile work environment,
 
 see
 
 Brief of Plaintiffs Adorno and Womble Submitted in Opposition to Defendant’s Motion for Summary Judgment, filed January 5, 2004 (Docket # 54) (“PL Mem.”), at 4-5 (citing,
 
 inter alia, Mack v. Otis Elevator Co.,
 
 326 F.3d 116 (2d Cir.),
 
 cert. denied,
 
 —U.S. -, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003)), is misplaced as such case law is based on specific policies reflected in the Title VII statute relating to the use of “economic power” by a supervisor and “policies of encouraging forethought by employers,”
 
 Mack,
 
 326 F.3d at 124-25. Such case law does not supplant New York law on vicarious liability in a diversity action.